Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/07/2016 12:12 PM CDT

Donald L. Shandera III, father of the minor
child Austyn M. Shandera, appellee, v.
Kaitlyn Ann Schultz, appellant.
___ N.W.2d ___

Filed January 19, 2016.    No. A-14-1158.

1. **Paternity: Appeal and Error.** In a filiation proceeding, questions con-
cerning child custody determinations are reviewed on appeal de novo on
the record to determine whether there has been an abuse of discretion
by the trial court, whose judgment will be upheld in the absence of an
abuse of discretion. In such de novo review, when the evidence is in
conflict, the appellate court considers, and may give weight to, the fact
that the trial court heard and observed the witnesses and accepted one
version of the facts rather than another.
2. **Child Custody.** Nebraska's removal jurisprudence does not apply to a
child born out of wedlock where there has been no prior adjudication
addressing child custody or parenting time. However, it is proper to
give some consideration to the factors in *Farnsworth v. Farnsworth*, 257
Neb. 242, 597 N.W.2d 592 (1999), in determining custody based on the
child's best interests.
3. ____. To prevail on a motion to remove a minor child, the custodial par-
ent must first satisfy the court that he or she has a legitimate reason for
leaving the state. After clearing that threshold, the custodial parent must
next demonstrate that it is in the child's best interests to continue living
with him or her.
4. ____. There are three broad considerations in deciding whether removal
is in a child's best interests: (1) each parent's motives for seeking or
opposing the move, (2) the potential that the move holds for enhanc-
ing the quality of life for the child and the custodial parent, and (3)
the impact such a move will have on contact between the child and the
noncustodial parent.
5. ____. In deciding whether removal is in a child's best interests, the
court considers the child's quality of life, which may be further broken

down into numerous factors that can be considered by the trial court in assessing the potential for enhancing the quality of life for the child and custodial parent.

6. **Evidence: Appeal and Error.** Where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

7. **Jurisdiction: Appeal and Error.** When the jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from the trial court.

8. **Child Custody: Jurisdiction: States.** The Uniform Child Custody Jurisdiction and Enforcement Act was enacted to serve the following purposes: (1) to avoid interstate jurisdictional competition and conflict in child custody matters, (2) to promote cooperation between courts of other states so that a custody determination can be rendered in a state best suited to decide the case in the interest of the child, (3) to discourage the use of the interstate system for continuing custody controversies, (4) to deter child abductions, (5) to avoid relitigation of custody issues, and (6) to facilitate enforcement of custody orders.

9. ____: ____: ____. In order for a state to exercise jurisdiction over a child custody dispute, that state must be the home state as defined by the Uniform Child Custody Jurisdiction and Enforcement Act or fall under limited exceptions to the home state requirement specified by the act.

10. ____: ____: ____. The Uniform Child Custody Jurisdiction and Enforcement Act provides that a state has jurisdiction to make an initial custody determination only if it is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from the state but a parent or person acting as a parent continues to live in the state.

11. **Paternity: Child Custody.** It is well settled that in paternity cases, an unwed mother is initially entitled to automatic custody of the child, but that the issue must ultimately be resolved on the basis of the fitness of the parents and the best interests of the child.

12. **Attorney Fees: Words and Phrases.** The term "frivolous," as used in Neb. Rev. Stat. § 25-824(2) (Reissue 2008), connotes an improper motive or legal position so wholly without merit as to be ridiculous.

13. **Actions.** Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed.

Karen S. Nelson, of Schirber & Wagner, L.L.P., for appellant.

Kelly T. Shattuck, of Vacanti Shattuck, for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Pirtle, Judge.

## INTRODUCTION

Kaitlyn Ann Schultz (Kaitlyn) appeals from an order of the district court for Washington County finding that Donald L. Shandera III is the biological father of Austyn M. Shandera and awarding custody of Austyn to Donald. Based on the reasons that follow, we affirm.

## BACKGROUND

Kaitlyn and Donald were in a relationship and began living together in April 2010. In October 2012, Kaitlyn felt the relationship was no longer working and she moved out. She subsequently became pregnant and moved back in with Donald in May 2013. Austyn was born in August 2013.

Over Thanksgiving 2013, Kaitlyn went to visit her mother in Georgia, and upon returning, she ended her relationship with Donald and she and Austyn moved out of Donald's home. On December 4, Kaitlyn moved her belongings out of Donald's home. Kaitlyn then moved to Texas with Austyn, where they continued to live at the time of trial.

On December 9, 2013, Donald filed a petition to establish paternity and custody. A temporary order was entered on May 28, 2014, allowing Kaitlyn to stay in Texas pending trial and granting Donald five 2-week blocks of parenting time before the trial date.

Trial was held on September 3, 2014. Both parties testified, as well as several other witnesses. Donald testified that Kaitlyn had talked to him about moving with Austyn to Texas, but that he did not agree to the move, because he did not want Austyn

to leave. Kaitlyn told Donald and friends that she was leaving Nebraska to get a better job and better housing. Further, she told Donald that she had a job in Texas that was going to pay $35 an hour, but this turned out not to be true.

When Kaitlyn went on maternity leave, she was working at a nursing home in Omaha, Nebraska, making $18.22 an hour. When she went back to work in October 2013, she started working for a different nursing home located in Blair, Nebraska. She took a pay cut, earning $17 per hour, but it allowed her to be closer to Austyn because she no longer had to drive to Omaha. She worked from 2 to 10 p.m. on Mondays, Wednesdays, and Fridays. On the days she worked, she would take Austyn to daycare around 1:30 p.m. and Donald would pick her up around 6 p.m. Kaitlyn testified that on Tuesdays and Thursdays, she was the sole caregiver for Austyn until around 10 p.m. because Donald was taking college classes on those days after work. Kaitlyn testified that she was primarily responsible for feeding Austyn, changing diapers, clothing and bathing Austyn, attending doctor appointments, and putting Austyn down for naps. Kaitlyn also testified that she was often the primary caregiver on the weekends, because Donald was helping his family with harvesting.

Donald testified that while Kaitlyn was on maternity leave, he would routinely wake up each morning with Austyn and give her a bottle before he went to work and would put her to bed almost every night. When he got home from work, he would spend time with Austyn. Donald testified that when Kaitlyn went back to work after maternity leave and was working until 10 p.m., he would pick up Austyn from daycare around 6 p.m. and take care of her the rest of the evening. Kaitlyn acknowledged that Donald was a good father and that she did not have concerns about his parenting ability, but testified that his help with Austyn was generally at her request.

The evidence showed that Donald has lived in Nebraska for all but 2 years of his life, had recently completed college,

and had maintained steady employment. The home in Blair where Kaitlyn and Donald were living when Austyn was born was owned by Donald's parents. At the time of trial, Donald continued to live in the three-bedroom home. Donald's parents also live in Blair. Donald also testified that he has numerous family members that live within about an hour's drive of Blair. Kaitlyn's father lives in Texas, and her mother lives in Georgia. Kaitlyn acknowledged that her only family support in Texas was her father.

When Kaitlyn and Austyn first moved to Texas, they lived with Kaitlyn's father. At the time of trial, she had been renting a two-bedroom apartment for her and Austyn since April 2014, which was somewhere between 20 to 40 minutes from her father's home. When Kaitlyn first moved to Texas, she obtained a job earning $22 an hour. She did not have health benefits, and Austyn was on Medicaid. At the time of trial, she was working at a different job, where she was earning $23.50 an hour and had full benefits. Kaitlyn was also attending a community college, working toward a degree in nursing.

Kaitlyn acknowledged that there was no financial advantage to her move to Texas. She testified that from the time she went back to work after maternity leave until she moved to Texas, Austyn's daycare provider, who was a friend, had not charged her anything for daycare. Kaitlyn testified that at some point, the provider was going to start charging her $100 per week, or $400 per month. Kaitlyn testified that in Texas, she was incurring $580 per month in childcare.

Kaitlyn's mental health was also brought up as an issue of concern. Kaitlyn had been treated for attention deficit disorder and anxiety since she was 10 years old. She testified that at one point, she was taking the highest possible dosage of medication to treat her mental health issues. Due to safety concerns for the baby when she was pregnant, at the suggestion of her psychiatrist, she discontinued the medications during pregnancy and during the time she was breastfeeding Austyn. As

of the date of trial, Kaitlyn had not resumed her medication and had not seen a psychiatrist about what medication she should be taking.

Following trial, the court found that Donald was Austyn's biological father and awarded Donald sole custody of Austyn, subject to Kaitlyn's reasonable parenting time.

## ASSIGNMENTS OF ERROR

Kaitlyn assigns that the trial court erred in (1) applying Nebraska's removal jurisprudence to an initial custody determination in a paternity action, (2) failing to make findings under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), and (3) failing to give her preference in custody of Austyn.

## STANDARD OF REVIEW

[1] In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012).

## ANALYSIS

*Custody.*

Kaitlyn first assigns that the trial court erred in applying Nebraska's removal jurisprudence to an initial custody determination in a paternity action. In its order, the court found that both parties were fit parents and that therefore, the court needed only to determine the best interests of Austyn in regard to which parent should have sole custody. The court stated that a factor affecting the best interests of the child was the fact that Kaitlyn had moved to Texas and intended to stay in

Texas regardless of the outcome of the custody determination. The trial court noted that Nebraska's jurisprudence regarding the removal of minor children from the State of Nebraska did not mandatorily apply to a child born out of wedlock where there has been no prior adjudication addressing child custody and parenting time. However, the court stated that based on the instructive language in *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009), it gave some consideration to the factors set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) (factors used to determine whether custodial parent should be allowed to remove child from state), in determining Austyn's best interests. The court further found that although it considered the removal factors, Kaitlyn did not have the burden of proof in regard to establishing the factors.

[2] In *Coleman v. Kahler, supra*, a father and mother were in a relationship from which two children were born, but they were never married. Various orders regarding paternity and child support were entered, but no custody determinations were made, and the mother eventually moved with the children out of state. *Id.* The trial court awarded custody of the parties' minor children to the mother, finding that it was in the best interests of the children to award the mother custody and to allow her to remove the children out of the state. *Id.* On appeal, the father asserted that the trial court erred in denying his request for custody and in allowing the mother to remove the children, because she did not meet the test set forth in *Farnsworth*. The mother argued that the *Farnsworth* test was inapplicable. *Coleman v. Kahler, supra*. This court held that Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time. *Id.* However, we further held that it was proper to give some consideration to the *Farnsworth* factors in determining custody based on the child's best interests. The *Coleman* court then set out the three broad considerations enunciated in *Farnsworth*

used in considering whether removal is in the children's best interests, and applied them to the evidence presented in *Coleman*.

[3-5] *Farnsworth v. Farnsworth, supra*, provides that to prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.* There are three broad considerations in deciding whether removal is in a child's best interests: (1) each parent's motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial parent. *Id.* The second consideration, the child's quality of life, may be further broken down into numerous factors that can be considered by the trial court in assessing the potential for enhancing the quality of life for the child and custodial parent. See *id.*

Kaitlyn contends that based on the court's holding in *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009), it was proper for the trial court to give some consideration to the three broad considerations in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), to assist in determining Austyn's best interests, but that the court erred in doing a complete *Farnsworth* analysis. She contends that by weighing all the *Farnsworth* factors used to determine whether removal is in a child's best interests, the court failed to consider Austyn's best interests in regard to custody. Specifically, she suggests that the court failed to consider that she has been Austyn's primary caregiver since December 2013, when she moved to Texas when Austyn was 4 months old.

The *Coleman* court said that it was proper to give some consideration to the *Farnsworth* factors in determining custody and set out the three broad considerations enunciated

in *Farnsworth* used in considering whether removal is in the children's best interests. As previously stated, the *Farnsworth* case sets out many factors that can be considered under the quality-of-life consideration. The trial court in the present case specifically addressed a number of the quality-of-life factors. It also discussed whether Kaitlyn had a legitimate reason for leaving the state and her reasons for seeking the move. Therefore, the trial court did not do a complete *Farnsworth* analysis, as Kaitlyn contends. Other than the legitimate reason for leaving the state discussion, the trial court considered only the three broad considerations set out in *Farnsworth* and was following what the *Coleman* case held was appropriate to consider.

The trial court first discussed whether Kaitlyn had a legitimate reason to leave the state and concluded that there was no compelling economic reason which justified removing Austyn from the state and that Kaitlyn's motivation was solely to make herself happy.

The trial court next discussed each parent's motives for seeking or opposing the removal. The court mentioned that Kaitlyn testified that she was "miserable" in Nebraska and that she is happy in Texas. She also testified that she wanted to live near her father. The court found that her motive for removing Austyn to Texas was not entirely to keep Austyn away from Donald. The court further found that although Kaitlyn and Donald may have discussed Kaitlyn and Austyn's moving to Texas, there was not a mutual agreement about the relocation.

The trial court next discussed some of the quality-of-life removal factors as set forth in *Farnsworth*—specifically, the emotional, physical, and developmental needs of the child; the extent to which Kaitlyn's income will be enhanced; the degree to which housing and living conditions would be improved; the quality of the relationship between the child and each parent; and the strength of the child's ties to the community and extended family. In discussing these factors, the trial

court noted that the child was only 1 year old, but that once she reached school age, she would attend school in the Blair school district if she lived in Nebraska. There was evidence indicating this was an above-average school district, and there was no evidence regarding the quality of the school district she would attend in Texas. The court noted, as previously discussed, that there was no financial advantage to living in Texas for Kaitlyn. In regard to living conditions, Austyn had been living in a three-bedroom home in Blair before moving to Texas, whereas in Texas, she lives in an apartment. The court stated that if the child lives in Texas, she will have a relationship and bond with Kaitlyn, but that the relationship with Donald would be extremely limited. It stated that the quality of the relationship with both parents would be better if Austyn lived in close proximity to both parents, but that that would not be possible, given that Kaitlyn indicated she was going to stay in Texas regardless of whether she was awarded custody. The court noted that only Austyn's maternal grand-father lives in Texas. In Nebraska, however, there was a strong support system of family that lived within a 2-hour drive of Blair, including paternal grandparents, great-grandparents, aunts, uncles, and cousins.

[6] In addition to considering the factors in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), the trial court considered the credibility of the witnesses, stating that it was concerned about Kaitlyn's overall credibility and that it found Donald to be a more credible witness than Kaitlyn. Where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012).

The court also considered the stability of each parent and the physical environment offered by each parent. The trial court stated that Kaitlyn has had a series of jobs over the years and has had difficulty maintaining long-term employment for

miscellaneous reasons. It further noted that Kaitlyn moved to Texas with the child without having stable employment or a permanent residence before the move. Also, Kaitlyn admitted that she has been prescribed psychotropic medications and has taken such medications since she was 10 years old. She stopped taking the medications when she was pregnant, but was still off the medications and had not consulted with a doctor regarding her continued use of the medications. The court also mentioned that although Kaitlyn has been more actively involved in the physical care of the child, Donald was entrusted with the care of the child when the parties were living together and recently had been actively involved as a result of the temporary order which gave him parenting time.

The trial court considered many factors in making a custody decision in the best interests of Austyn. The court could not ignore the fact that Kaitlyn was living in Texas and Donald was living in Nebraska, and it took those circumstances into account in determining best interests. Based on *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009), it was proper for the court to consider the removal factors set out in *Farnsworth v. Farnsworth, supra*, that it did in determining Austyn's best interests for custody purposes. Further, the trial court recognized that Kaitlyn did not have the burden of proof that she would have in a true removal case.

Based on our de novo review of the record, the trial court did not abuse its discretion in finding that it was in Austyn's best interests to award Donald sole custody.

*UCCJEA.*

Kaitlyn assigns that the trial court erred in failing to make a finding as to whether it had jurisdiction under the UCCJEA, Neb. Rev. Stat. §§ 43-1226 to 43-1266 (Reissue 2008 & Cum. Supp. 2014), to make a custody determination. She contends that the trial court, on its own motion, should have made a determination under § 43-1244 that it was an inconvenient forum and lacked jurisdiction, because by the time of trial,

Austyn had resided in Texas longer than in Nebraska and had significant connections with Texas.

[7] In considering whether jurisdiction existed under the UCCJEA, when the jurisdictional question does not involve a factual dispute, determination of the issue is a matter of law, which requires an appellate court to reach a conclusion independent from the trial court. *Zimmerman v. Biggs*, 22 Neb. App. 119, 848 N.W.2d 653 (2014).

[8] The UCCJEA was enacted to serve the following purposes: (1) to avoid interstate jurisdictional competition and conflict in child custody matters, (2) to promote cooperation between courts of other states so that a custody determination can be rendered in a state best suited to decide the case in the interest of the child, (3) to discourage the use of the interstate system for continuing custody controversies, (4) to deter child abductions, (5) to avoid relitigation of custody issues, and (6) to facilitate enforcement of custody orders. *Zimmerman v. Biggs, supra.*

[9,10] The most basic proposition under the UCCJEA is that in order for a state to exercise jurisdiction over a child custody dispute, that state must be the home state as defined by the UCCJEA or fall under limited exceptions to the home state requirement specified by the act. § 43-1238; *Zimmerman v. Biggs, supra.* The UCCJEA provides that a state has jurisdiction to make an initial custody determination only if it is the home state of the child on the date of the commencement of the proceeding or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from the state but a parent or person acting as a parent continues to live in the state. § 43-1238; *Zimmerman v. Biggs, supra.* "Home state," defined in § 43-1227(7), means

> the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months

of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.

Austyn was born in Nebraska in August 2013 and remained in Nebraska until Kaitlyn took her to Texas in December 2013. Donald filed his complaint on December 9. There is some disagreement on whether Kaitlyn left Nebraska on December 4 or December 10; however, it is immaterial in determining whether the trial court had jurisdiction. The determination of whether the trial court had jurisdiction is based on whether Nebraska was Austyn's home state when the action was commenced. The UCCJEA defines "[c]ommencement" as "the filing of the first pleading in a proceeding." § 43-1227(5).

It is apparent from the record that Nebraska was the home state of Austyn when the action was filed. The record indicates that the current proceeding was the first to establish paternity of Austyn, and there is no indication of any prior custody order concerning Austyn.

Under § 43-1238, the district court had jurisdiction to make an initial custody determination. The trial court found that it had jurisdiction over the parties and the subject matter of this action when it entered the temporary order on May 28, 2014, and when it entered the decree on December 2. We also note that the record does not contain any request by Kaitlyn for the court to decline to exercise its jurisdiction because it was an inconvenient forum. Kaitlyn's assignment of error is without merit.

*Preference in Custody.*

[11] Kaitlyn next assigns that the trial court erred in failing to give her preference in determining custody of Austyn. She contends that in Nebraska, it is well settled that in paternity cases, an unwed mother is initially entitled to automatic custody of the child, but that the issue must ultimately be resolved on the basis of the fitness of the parents and the best interests

of the child. See *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). She argues, therefore, that she was "entitled to a presumption of custody unless [Donald] could overcome that presumption." Brief for appellant at 26-27.

Kaitlyn is correct in that an unwed mother is initially entitled to automatic custody of the child when the child is born. However, once an action to determine custody is filed, the issue of custody must ultimately be resolved on the basis of the fitness of the parents and the best interests of the child. *Citta v. Facka, supra*. In the present case, the trial court found both parents to be fit and, therefore, the only issue for the court to consider in determining custody was the best interests of Austyn. There is no merit to Kaitlyn's final assignment of error.

*Donald's Motion for Attorney Fees.*

During the pendency of this appeal, Donald's attorney filed a motion for attorney fees, in which he alleged: "[Kaitlyn's] appeal of this matter is frivolous and is a waste of this Court's resources." Kaitlyn's attorney filed an objection, in which she alleged Donald's motion was premature and asserted the appeal was not "frivolous."

[12,13] Neb. Rev. Stat. § 25-824(2) (Reissue 2008) provides:

Except as provided in subsections (5) and (6) of this section, in any civil action commenced or appealed in any court of record in this state, the court shall award as part of its judgment and in addition to any other costs otherwise assessed reasonable attorney's fees and court costs against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith.

The term "frivolous," as used in subsection (2) of this section, connotes an improper motive or legal position so wholly

without merit as to be ridiculous. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). Any doubt about whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question. *TFF, Inc. v. SID No. 59*, 280 Neb. 767, 790 N.W.2d 427 (2010).

Upon our de novo review of the record presented to us and the written briefs filed by the parties, and after granting and hearing oral argument in this matter, we find Kaitlyn's appeal was not frivolous or made in bad faith, and as a result, Donald's motion for attorney fees is denied.

## CONCLUSION

We conclude that the trial court did not err in considering some of the factors used in a removal case in making an initial custody determination in a paternity action. We further conclude that the trial court did not err in failing to make findings under the UCCJEA and did not err in failing to give Kaitlyn preference in custody of Austyn. Accordingly, the order of the trial court awarding Donald sole custody of Austyn is affirmed. Donald's motion for attorney fees is denied.

AFFIRMED.