IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

BURTON V. SCHLEGEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DWAYNE BURTON, APPELLEE AND CROSS-APPELLANT,

V.

ALEXANDRA SCHLEGEL, APPELLANT AND CROSS-APPELLEE.

Filed May 24, 2016.    No. A-15-761.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Kevin Ruser and Ryan P. Sullivan, of University of Nebraska Civil Clinical Law Program, and Casey Steadman, Jake Harberg, Michael Mills, and Nick Glasz, Senior Certified Law Students, for appellant.

Eddy M. Rodell for appellee.

INBODY, PIRTLE, and BISHOP, Judges.

BISHOP, Judge.

### I. INTRODUCTION

Dwayne Burton brought this action against Alexandra Schlegel to establish paternity and custody of Easton Burton, Schlegel's minor son. Following a bench trial, the district court for Lancaster County determined that Burton was Easton's biological father and entered a decree addressing custody, parenting time, child support, and childcare expenses, among other issues. Schlegel appeals, and Burton cross-appeals. We affirm.

### II. BACKGROUND

At an unspecified time prior to Easton's birth, Burton and Schlegel began a relationship while Burton was living in Utah and Schlegel was living in Wyoming. Schlegel became pregnant, and the parties decided that Schlegel, and her three children from previous relationships, would

- 1 -

move to Utah to live with Burton. During Schlegel's pregnancy, either Burton accepted a job offer in New Mexico or his job was transferred there, and Schlegel and her children moved with him. Schlegel gave birth to Easton in New Mexico in December 2013. Shortly thereafter, Schlegel and Burton's relationship ended. In February 2014, Schlegel moved with Easton and her other children to Lincoln, Nebraska, to live with her sister. Also in February, Burton returned to Utah, where he subsequently married another woman, with whom he had previously had a daughter out of wedlock.

On June 6, 2014, Burton initiated this action by filing a complaint to establish paternity and custody. On December 15, the district court entered a temporary order awarding Schlegel temporary custody of Easton, granting Burton 2 weeks of parenting time every 2 months, ordering Burton to pay temporary child support of $350 per month, and directing the parties to equally share all work-related childcare expenses.

A bench trial commenced on May 11, 2015. The parties' proposed parenting plans were received into evidence; we discuss the plans first to give context to the parties' testimony that follows.

Burton submitted a proposed parenting plan under which the parties would receive joint legal custody of Easton, and Burton would receive physical custody. The plan proposed that Schlegel would have 2 weeks of parenting time every 2 months until Easton began Kindergarten. At that time, Schlegel would have parenting time during the summer break and spring break, and on alternating holidays. Burton submitted an alternative parenting plan under which the parties would receive joint legal and physical custody, with the parties exercising parenting time on a "two month on/two month off" schedule. The alternative plan did not address parenting time after Easton began school.

Schlegel submitted a proposed parenting plan under which she would receive legal and physical custody of Easton. Under Schlegel's plan, Burton would have 2 weeks of parenting time every 2 months until Easton began preschool in January 2018. At that time, Burton would have 4 weeks of parenting time each summer; the summer parenting time would increase to 8 weeks once Easton turned 8 years old and would continue through Easton's minority.

We now summarize the parties' testimony. Burton called Schlegel as his first witness. She testified that she lived in Lincoln with Easton and her three other children--two sons and a daughter--who ranged in age from 8 to 14. She opposed Burton's proposed parenting plan under which Burton would receive physical custody of Easton, because she had been Easton's primary caregiver since his birth. She also opposed Burton's alternative parenting plan, because she believed it would be inappropriate for a child as young as Easton to be away from his mother, his primary caregiver, for 2 months at a time.

Schlegel admitted she had a pending charge for aggravated driving under the influence (DUI). It was aggravated because her blood alcohol content was over 0.15. Schlegel's license had been revoked, and she was required to use an ignition interlock device to drive. Easton was with Burton at the time of Schlegel's DUI offense. Schlegel had no other arrests as an adult.

Schlegel also admitted that she had a pending case in juvenile court concerning her 14-year-old daughter. The case was set for an adjudication hearing on May 19, 2015. A copy of the juvenile court petition was received into evidence; it alleged that Schlegel's daughter was a

child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014) in that she was in significant need of mental health treatment or services, which Schlegel had failed to obtain. Schlegel indicated she was not concerned about the case, because her daughter had been in counseling when the case was filed. Schlegel clarified that her daughter had not been removed from her custody and remained living with her.

Burton testified next. He lived in Utah with his wife, their 5-year-old daughter, and his 11-year-old stepson. Burton explained that he had been in a relationship with the woman who was now his wife prior to being in a relationship with Schlegel. When he and Schlegel ended their relationship, Burton rekindled his relationship with the woman who became his wife. Burton testified that he assisted Schlegel in moving to Lincoln after their relationship ended, because he believed it would be best for Schlegel's other children if they lived there, apparently because they would be closer to their fathers.

Burton testified that he was employed as an industrial construction manager. His employment used to require a lot of travel, but he had acquired a different position with the same company that no longer required him to travel.

Addressing the parenting time he had exercised with Easton, Burton testified that the first period he spent alone with Easton was in February 2014 while Schlegel was transitioning to Lincoln. After that, Burton was working on a project in Wyoming and attempted to have parenting time with Easton. Before Schlegel would allow him to see Easton, she wanted him "to send text messages and e-mails to [his] fiancee [sic] telling her that [he] never wanted to see her again and that [he] was going to attempt to rekindle a relationship with . . . Schlegel." She also wanted Burton to give her $1,500 for an attorney. The parenting time did not take place. Burton later had 1 week of parenting time while working on a project in Colorado; he could not remember the exact dates of that visit.

Burton further testified that later in 2014, he had 9 days of parenting time around Labor Day. He again had 9 days of parenting time in October. During the October parenting time, Easton had to have emergency surgery for "intussusception." Schlegel traveled to Utah while Easton was in the hospital, and, according to Burton, she made inappropriate comments and threats while in the hospital room with Burton and his wife. Burton also had parenting time in December 2014/January 2015, and during the last week of February and the first week of March. Burton's most recent parenting time had ended the Saturday before trial. Schlegel had not been cooperative when it came to parenting time; for example, she had refused to meet Burton at the airport, requiring him to rent a car to pick up Easton.

Burton believed that Easton's emotional, physical, and developmental wellbeing would be "greatly improved" if he resided in Utah. Burton explained that he was "a loving and attentive father" and had "always done everything that [wa]s in the best interest of [his] child and gone far and above anything that was ever asked or expected of [him]." He further explained that he and his wife were building a new 5-bedroom house in Utah that was expected to be completed in October 2015. The closest school would be Excelsior Academy, which the Utah Department of Education rated as 1st in the state in science, 9th in mathematics, and 15th in language arts. Burton's wife was a stay-at-home mother and would care for Easton during the day until he entered

preschool. Easton would have two sets of grandparents in Utah, as well as seven aunts and uncles and eight cousins, all within a 20-minute drive.

Addressing his travel expenses associated with his parenting time, Burton testified that his average travel costs for his prior two visits was approximately $1,000 per visit. He submitted an exhibit detailing the specific costs. Burton would have to purchase a plane ticket for Easton once he turned 2 years old in December 2015, which would increase the travel costs.

On cross-examination, Burton admitted he had a prior conviction of domestic violence against his first wife, as well as a conviction of theft; both convictions were approximately 9 years old. He also "voluntarily removed himself" from a situation "pending an investigation" into possible child abuse regarding his stepson. The investigation was in the context of a custody dispute between Burton's wife and the stepson's "adopted father." He testified the investigation was "unfounded."

After Burton rested his case, Schlegel testified in her own behalf. She began living in Lincoln at age 10 and attended high school there. Eventually, she moved to Wyoming with her now ex-husband. Her relationship with Burton brought her to Utah and then to New Mexico, until she returned to Lincoln in February 2014. According to Schlegel, she wanted to move to Utah with Burton, but he insisted it would be better for Schlegel and her children to move to Lincoln where Schlegel had family.

Schlegel testified that when she returned to Lincoln, she first lived with her sister, but at the time of trial she lived in a 5-bedroom rental home with her four children. She was in the process of purchasing a 3-bedroom home to which she had plans to add a fourth bedroom. The mortgage payment, including taxes and insurance, would be approximately $704 per month, which was less than the approximately $950 per month she paid in rent.

Schlegel had worked as an accounting assistant at a company in Lincoln since October 2014. She earned between $22,000 and $24,000 per year. While Schlegel worked, Easton was in daycare, which according to Schlegel, was a wonderful daycare that Easton loved. Schlegel had to pay for daycare year-round, because Easton would lose his spot if she did not pay during his absence.

Schlegel wanted to continue the same parenting time schedule that Burton had under the temporary order. She explained that initially, 2 weeks of parenting time "felt like a very long time," but she understood that Burton and Easton needed to see each other. Schlegel agreed there had been problems surrounding Burton's parenting time, usually because of the hours that Burton picked Easton up or dropped him off, or because of short notice.

Schlegel explained that she had some concerns with Burton's parenting. Specifically, when she and Burton lived together, Burton was rough physically when disciplining her two other sons.

At the conclusion of trial, the district court took the matter under advisement. On July 24, 2015, the court entered a written order in which it determined that Burton was Easton's biological father and granted Burton and Schlegel joint legal custody; granted Schlegel physical custody; awarded Burton parenting time for the months of February, May, and August each year, plus November or December on an alternating-year basis; ordered Burton to pay child support of $400 per month, a deviation of $235 below the guideline amount of support, based on Burton's travel

expenses associated with parenting time; and directed each party to be responsible for his or her own work-related childcare expenses. The court adopted a parenting plan consistent with its order.

The court also noted that the parenting time schedule "may not work once the child is of school-age." The court indicated: "When the child reaches the age of five, he becomes school-age which the Court deems a change in circumstances. At that time the parties may consider a change to the parenting plan adopted by this order." Schlegel timely appealed, and Burton cross-appealed.

## III. ASSIGNMENTS OF ERROR

Schlegel assigns that the district court abused its discretion in (1) "granting Burton month-long periods of parenting time every three months instead of two-week periods of parenting time every other month and in not adopting a mirror image of the parenting time proposal submitted by Burton for after Easton entered Kindergarten," (2) holding that "Easton's turning five years old would constitute a material change of circumstances not within the parties' anticipation," (3) "awarding Burton a downward deviation from his child support obligation in the amount of $235 per month," and (4) "in requiring Schlegel to pay for all work-related child care expenses instead of an amount in accordance with her obligor's parental contribution."

On cross-appeal, Burton assigns that the district court erred in granting sole physical custody to Schlegel.

## IV. STANDARD OF REVIEW

In filiation proceedings, on matters of custody, parenting time, and child support, an appellate court reviews a trial court's judgment de novo on the record to determine whether there has been an abuse of discretion by the trial judge, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Lancaster v. Brenneis*, 227 Neb. 371, 417 N.W.2d 767 (1988).

## V. ANALYSIS

### 1. SCHLEGEL'S APPEAL

As stated, Schlegel challenges the district court's rulings on the issues of parenting time, child support, and child care expenses. We address each issue in turn.

### (a) Parenting Time

Schlegel argues the district court abused its discretion "by adopting a parenting plan that results in Easton being separated from Schlegel, his primary caretaker, for one month out of every three months during the year." Brief for appellant at 9. She contends that this "unorthodox parenting plan is not in the best interests of Easton, a young child who has not even entered school, because it creates a situation resulting in emotional upheaval and a lack of stability." *Id*. Schlegel "does not dispute that Burton is entitled to approximately twelve weeks of parenting time per year plus holidays, which is in line with" local rules, or that a traditional parenting time schedule is impractical because of distance, but she contends the schedule adopted by the district court is

"unworkable . . . and placed undue weight on 'distance, cost of travel, and other circumstances.'" *Id*. at 10.

Burton responds that the parenting time schedule adopted by the district court is reasonable. He notes that it will require significantly less travel than the temporary parenting time schedule. He further maintains that the "[m]onth long blocks of parenting time . . . will allow Easton to build a bond with his father." Brief for appellee at 10.

A parenting plan, which is required to apportion parenting time, must serve the best interests of the child. Neb. Rev. Stat. § 43-2929(1) (Cum. Supp. 2014). In considering the minor's best interests, the court is guided by Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2014). The statute first lists five requirements for the best interests of the child, including a "parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." § 43-2923(1). Also among the first five requirements is that "the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child." § 43-2923(3).

The statute also includes a non-exhaustive list of factors the court is to consider, including the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; the general health, welfare, and social behavior of the minor child; credible evidence of abuse inflicted on any family or household member; and credible evidence of child abuse or neglect or domestic intimate partner abuse. § 43-2923(6). Other relevant non-statutory factors include the age and health of the child, the character of the noncustodial parent, the place where parenting time will be exercised, the frequency and duration of visits, the likely effect of parenting time on the child, the availability of the child for parenting time, and the likelihood of disrupting an established lifestyle otherwise beneficial to the child. See *Aguilar v. Shulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

Generally, a reasonable parenting time schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent, and the determination of reasonableness is to be made on a case-by-case basis. *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). Where, as here, the parents reside in different states hundreds of miles apart, preservation of the familial relationship between the minor child and the noncustodial parent is an important objective. *Id*. Of course, the frequency and the total number of days of parenting time and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

Although Schlegel contends that month-long periods of parenting time four times a year is unreasonable, while 2 weeks of parenting time every 2 months would have been reasonable, there is little evidence in the record to support this contention. Schlegel testified that she opposed Burton's alternative proposed parenting plan under which the parties would have had joint physical custody on an alternating 2-month basis, because she believed it would be inappropriate for a child

as young as Easton to be away from his mother, his primary caregiver, for such long periods. Otherwise, there was no evidence to suggest that it would not be in Easton's best interests to spend extended periods of parenting time with his father.

Specifically, Schlegel did not present testimony from a psychologist or other expert explaining Easton's developmental needs or opining that extended periods of parenting time would be detrimental to a child Easton's age. Moreover, there was no evidence that Easton had difficulty adjusting to the temporary parenting time schedule (2-week blocks every 2 months), or that there was reason to believe he would have difficulty adjusting to a schedule with longer periods of parenting time. Although Schlegel testified that initially, 2 weeks of parenting time "felt like a very long time," she also understood that Burton and Easton needed to see each other.

We note that although Schlegel has been Easton's primary caregiver since birth, this is not a situation in which Easton is being subjected to extended periods of parenting time with a father he does not know. The district court found that Burton "has attempted to remain part of the minor child's life and appears to be responsible and concerned for [Easton] and interested in his relationship with him." The evidence supports this determination. Burton lived with Schlegel and Easton for approximately the first 2 months of Easton's life, and following the end of Schlegel and Burton's relationship, he visited Easton a number of times for periods between 9 days and 2 weeks. Burton has already put forth significant effort to build a relationship with Easton, and the permanent parenting time schedule will permit him to strengthen that relationship. It is only because Easton is not yet school-age that Burton is able to exercise extended periods of parenting time throughout the year.

We also note that, while undoubtedly each transition from Lincoln to Utah and back will be a significant adjustment for Easton as well as his parents, the parenting time schedule adopted by the district court will require fewer exchanges of the child per year than the temporary schedule.

In sum, while we are cognizant of Schlegel's concerns that extended periods away from his primary caregiver may not be the most desirable situation for a 2½-year-old child, we cannot say the court abused its discretion under the circumstances. Without evidence to substantiate Schlegel's concerns over the impact of extended periods of parenting time on Easton's wellbeing, the district court had little guidance on this matter. Ultimately, the court adopted a parenting time schedule that essentially was a compromise between Schlegel's proposed parenting plan and Burton's alternative proposed parenting plan. While the extended periods away from Schlegel may not be ideal, they will allow Burton to strengthen his relationship with Easton during his early years.

(b) Parenting Time When Easton Reaches School Age

In her first and second assignments of error, Schlegel addresses the issue of parenting time when Easton reaches school age. She contends the court abused its discretion by "not adopting a mirror image of the parenting time proposal submitted by Burton for after Easton entered Kindergarten," as well as by holding that "Easton's turning five years old would constitute a material change of circumstances not within the parties' anticipation." Brief for appellant at 3. We address these issues together.

Schlegel argues that for an event to qualify as a material change of circumstances sufficient to justify a modification to a parenting plan, the event must have been something the parties did not contemplate at the time the parenting plan was entered. She contends that the parties and the district court knew that Easton would reach school age in the not-distant future, and the court should have entered a parenting time schedule to go into effect at that time. She maintains the court "'kick[ed] the can down the road,'" thereby forcing the parties to incur additional court costs and attorney fees in the near future. *Id*. at 12.

Burton responds by citing the rule that conditional judgments, which are dependent upon the occurrence of uncertain future events, are void. He further argues that although it is known that Easton will at some point enter school, it is unknown where the parties will be residing or what their circumstances will be at that time. He contends that requesting a parenting time schedule to go into effect when Easton attends school is "asking the Court to look into the future and decide what will be best for Easton" at that time. Brief for appellee at 11.

The "void conditional judgment rule" cited by Burton does not apply here for two reasons. A "conditional judgment" is one that purports to be final but that is dependent upon the occurrence of uncertain future events. *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006). When a judgment is dependent upon the happening of a future event that is "not an unknowable or uncertain future event," it is not a conditional judgment. See *Simons v. Simons*, 261 Neb. 570, 577, 624 N.W.2d 36, 41 (2001) (child support order that commenced upon father's release from prison was not a conditional judgment). As both parties acknowledge, Easton's school attendance is not an unknown or uncertain future event.

Moreover, the Nebraska Supreme Court has held that "the void conditional judgment rule does not extend to actions in equity or to equitable relief granted within an action at law." *Strunk v. Chromy-Strunk*, 270 Neb. at 934, 708 N.W.2d at 837. Issues of custody and parenting time arising within an action to establish paternity fall within the district court's general equity jurisdiction. *Blecha v. Blecha*, 257 Neb. 543, 599 N.W.2d 829 (1999). A court acting under its equity jurisdiction may enter a conditional judgment where it is necessary and equitable to do so. *Strunk v. Chromy-Strunk, supra*.

Since the void conditional judgment rule did not prohibit the court from entering a parenting time schedule to become effective once Easton reaches school age, the question is whether the court abused its discretion by not entering such a schedule.

In *Strunk v. Chromy-Strunk, supra*, the Nebraska Supreme Court explained that in *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), it erroneously applied the void conditional judgment rule to conditional child custody provisions in a dissolution decree "without considering the general propriety of applying such a rule in equity." *Strunk v. Chromy-Strunk*, 270 Neb. at 933, 708 N.W.2d at 836. Although the court clarified that the void conditional judgment rule does not apply in equity, it further explained that the conditional custody provisions in *Vogel* had been undesirable for reasons other than their conditional nature. *Strunk v. Chromy-Strunk, supra*. Specifically, the court indicated that "it was unnecessary and unwise to speculate as to the best interests of the child under changed circumstances." *Id*. at 934, 708 N.W.2d at 837. In other words, "'[t]he impact of . . . potential events on the children's best interests and the proper judicial

- 8 -

response to the potential events . . . [would be] better assessed at the time of their occurrence.'" *Id*., quoting *Vogel v. Vogel, supra*.

Although the present case does not involve a conditional custody order like that in *Vogel*, the same considerations are applicable here. While Easton's school attendance is not an unknown or uncertain future event, the question of what will be in his best interests at that time is unknown. By the time Easton reaches school age, Burton will have been exercising his month-long periods of parenting time for over 3 years, and it would be very difficult for the court at this time to predict how that arrangement will affect Easton. Furthermore, the parties' lives before and after Easton's birth involved frequent and significant changes, and it is reasonable to suspect that their circumstances will be different in 3 years. Given the significant distance between the parties and their history of frequent change, we cannot say the court acted unreasonably in declining to predict what will be in Easton's best interests when he reaches school age. In many cases, courts may not be justified in reserving the issue of school-age parenting time for future determination. Under the circumstances of this case, however, we agree with Burton that the district court did not abuse its discretion in doing so.

We also disagree with Schlegel that the court's order violates the general rule that a change in circumstances which was within the contemplation of the parties at the time of the decree is not a material change in circumstances for purposes of modification of a decree. See *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). The intent underlying that rule is that a proceeding to modify a decree is not a retrial of the original case nor a review of the original decree. See *Wagner v. Wagner*, 224 Neb. 155, 396 N.W.2d 282 (1986). The phrase "change of circumstances" should not be mechanically construed. *Marez v. Marez*, 217 Neb. 615, 350 N.W.2d 531 (1984).

While the district court was aware that Easton will reach school age in a few years, it essentially reserved ruling on what parenting time schedule will be in Easton's best interests at that time. Under these circumstances, addressing the issue in a future modification proceeding will not constitute "a retrial of the original case [or] a review of the original decree." *Wagner v. Wagner*, 224 Neb. at 157, 396 N.W.2d at 283. To hold otherwise would be to apply the phrase "change of circumstances" mechanically and in a manner contrary to the rule's purpose. As we explained above, given the parties' history of frequent change, the court acted reasonably in reserving the issue of school-age parenting time.

We also point out that the parenting plan adopted by the court contains provisions enabling the parties to minimize any court costs or attorney fees they may incur when addressing changes to the parenting time schedule when Easton reaches school age. The plan provides that "[t]o resolve future changes or conflicts regarding parenting functions, parenting time, or this Plan, the parties shall first seek solutions through mutual agreement, without the need for judicial intervention, . . . and if unsuccessful, then through the mediation process outlined in the Nebraska Parenting Act." Although the parenting plan requires court-approval before any modifications to the plan will be incorporated "into the court order," the parties will incur little to no expense if they are able to resolve any changes to the parenting time schedule through mutual agreement.

(c) Downward Deviation of Child Support

Schlegel next argues the court abused its discretion in deviating from the guideline amount of child support by $235 per month, or more than one-third, based on Burton's travel expenses. She contends that Burton "took significant affirmative action to bring these travel expenses upon himself," including moving to Utah and encouraging her to move to Lincoln. Brief for appellant at 14. She argues that Burton's documented travel expenses were elevated and that, at most, the deviation should be $100 per month.

Generally, child support payments should be set according to the Nebraska Child Support Guidelines, which are applied as a rebuttable presumption. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013); Neb. Ct. R. § 4-203 (Rev. 2011). A deviation in the amount of child support is allowed whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Pearson v. Pearson*, 285 Neb. 686, 828 N.W.2d 760 (2013). Deviations from the guidelines must take into consideration the best interests of the child. *Id.*; § 4-203.

The guidelines specifically address the type of deviation at issue here: "Any documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines." Neb. Ct. R. § 4-210. Only reasonable transportation expenses may reduce or abate a child support obligation, however. *Pearson v. Pearson, supra.* A custodial parent has some fixed and constant expenses in raising children, and these expenses do not decrease during extended periods of parenting time with the noncustodial parent, or simply because transportation costs significantly increase. *Id.* A court should consider the impact of increased travel expenses on both parents in light of the best interests of the child. *Id.*

Burton documented his travel expenses for the parenting time he exercised in December 2014/January 2015 and in February/March 2015. His total cost for the December/January parenting time, which involved flying to Nebraska, renting a car to drive to Utah and back with Easton, then flying home to Utah, was $1,280.35. His total cost for the February/March parenting time, which involved two roundtrip flights and a rental car in Omaha to pick up and drop off Easton, was $998.95. The exhibit Burton submitted documenting these expenses indicated that the cost of one of the flights for the first trip was increased because a storm delayed his flight, requiring him to purchase a ticket for a costlier flight, and the costs of the flights for the second trip were increased because the parenting time was arranged on short notice.

Although Schlegel contends the elevated travel costs should not have been considered for purposes of calculating a deviation from the guidelines, the court's deviation did not come close to compensating Burton for the elevated travel costs. Under the court's order, Burton will exercise parenting time four times per year. The deviation of $235 per month in child support amounts to $2,820 per year, or $705 per visit. Burton's documented travel expenses averaged approximately $1,140 per visit, which suggests the court took into consideration the fact that the documented travel costs were elevated. Furthermore, Burton testified that after Easton turned 2 years old in December 2015 (a date which has now passed), he would have to purchase a plane ticket for Easton, thereby increasing his travel expenses. Considering all of the evidence, the court did not abuse its discretion in awarding the deviation of $235 per month.

We also cannot accept Schlegel's contention that a deviation was not warranted because Burton's own actions resulted in the distance between him and Easton. The evidence was that Burton had strong ties to Utah and located there for legitimate reasons, and the same can be said for Schlegel's relocation to Lincoln. These considerations do not render the court's deviation from the child support guidelines unreasonable.

(d) Allocation of Work-Related Childcare Expenses

Schlegel's final argument is that the court abused its discretion by failing to allocate a portion of her work-related childcare expenses to Burton. She notes that Burton incurs no childcare expenses because his wife stays at home. She also notes that her percent contribution from worksheet 1, line 6, is 30.82%, while Burton's is 69.18%; she contends she should have to pay no more than 30.82% of the childcare expenses.

The child support guidelines provide a court with some discretion as to the amount it orders an obligor to contribute toward childcare expenses. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). The guidelines provide:

> Childcare expenses are not specifically computed into the guidelines amount and are to be considered independently of any amount computed by use of these guidelines. Care expenses for the child for whom the support is being set, which are due to employment of either parent or to allow the parent to obtain training or education necessary to obtain a job or enhance earning potential, shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution (worksheet 1, line 6) and shall be added to the basic support obligation computed under these guidelines.

Neb. Ct. R. § 4-214. Worksheet 1, line 6, represents each party's monthly net "percent contribution" of the parties' combined monthly net income.

A problem with Schlegel's argument is that she presented no evidence of her actual childcare expenses. In *Freeman v. Groskopf, supra*, the Nebraska Supreme Court explained that without knowing the actual cost of the childcare, it is nearly impossible for a court to exercise its discretion in allocating the childcare expenses in an appropriate manner. Here, without any evidence of the childcare costs Schlegel actually incurs, the district court did not abuse its discretion in failing to allocate any of the costs to Burton. See *id*. (because custodial parent did not provide evidence of actual cost of childcare, district court did not abuse its discretion in failing to order noncustodial parent to contribute to childcare expenses).

Furthermore, Schlegel's contention that she cannot be ordered to pay a greater percentage of the childcare expenses than her percent contribution from worksheet 1, line 6, is misplaced. Section 4-214 contains no mandatory language that childcare expenses must be allocated based upon the percentages attributed to each party under the child support guidelines; instead, it provides a cap on the percentage of such costs that an "obligor" can be ordered to pay. Specifically, it provides that childcare expenses "shall be allocated to the *obligor parent* as determined by the court, but shall not exceed the proportion of the *obligor's* parental contribution." (Emphases added.) § 4-214. The "obligor parent" is the parent obligated to pay child support under the

guidelines. See Neb. Ct. R. § 4-219 ("[u]nder no circumstances shall there be an increase in support due from the obligor solely because of an increase in the income of the obligee"). In this case, Burton is the obligor, and Schlegel is the obligee. Accordingly, her percentage of childcare expenses is not limited to the proportion of her parental contribution.

## 2. BURTON'S CROSS-APPEAL

On cross-appeal, Burton's only argument is that the district court abused its discretion in awarding physical custody to Schlegel. Burton notes his significant efforts to build a relationship with Easton, his financial stability, and the evidence of the quality of life Easton would have in Utah. Burton also relies upon Schlegel's pending DUI case and the pending juvenile case concerning Schlegel's daughter, as well as Schlegel's lack of cooperation with parenting time.

Generally, when a court is determining custody, it is to consider the same non-exhaustive list of best interest factors from § 43-2923 that we enumerated above in our discussion of parenting time. As with parenting time, the custody arrangement adopted by the court must serve the best interests of the child, § 43-2929(1), and provide for the child's safety, emotional growth, health, stability, and physical care. § 43-2923.

Furthermore, where a child is born out of wedlock to parents living in separate states, and there has been no prior custody determination, Nebraska's removal jurisprudence does not apply; the issue is not whether one or the other of the parents is free to relocate with the child, but, rather, which parent should be awarded permanent custody of the child as a matter of initial judicial determination. See *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004); *Shandera v. Schultz*, 23 Neb. App. 521, 876 N.W.2d 667 (2016); *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). Nevertheless, it is proper in such a case to give some consideration to the "removal" factors from *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), to the extent they apply, including: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact such a move will have on contact between the children and the noncustodial parent, when viewed in the light of reasonable parenting time. *Coleman v. Kahler, supra*.

The evidence in the present case revealed that neither parent was unblemished. Schlegel had a pending DUI case and a pending juvenile case regarding her 14-year-old daughter. The outcomes of those cases are not disclosed in the record; while Schlegel indicated she was not concerned about the juvenile case, she did not suggest that she had any intentions of fighting the DUI charge, which notably was her only criminal charge as an adult.

However, Burton had his own history, including convictions for domestic violence and theft. He also admitted that he "voluntarily removed himself" from a situation "pending an investigation" into possible child abuse regarding his stepson. He expressed his belief that the investigation was "unfounded."

Yet, these aspects of the parents' backgrounds did not indicate that either of them was unfit to have physical custody of Easton. Rather, the record suggested that Burton and Schlegel were caring, loving parents to Easton and were eager to have a strong relationship with him and to look out for his best interests. Undoubtedly, the evidence with the greatest ramifications for Easton's

best interests concerned the long distance between the parties. Because of the distance, the court's custody decision was bound to have a significant impact on the relationship between Easton and the noncustodial parent.

Given that Schlegel had been Easton's primary caregiver since his birth, and nothing indicated Schlegel had been anything but a loving and nurturing mother, the district court did not abuse its discretion in awarding Schlegel physical custody. If the court had placed physical custody with Burton, or even granted the parties joint physical custody, Easton would have been separated from his mother for longer periods of time throughout the year than he will be separated from her under the current parenting time schedule. While the evidence indicated Burton may have been more financially stable than Schlegel and was building a large home in Utah, this does not mean that separating Easton from his mother, who had been his primary caregiver since birth, was in his best interests. Regardless, the evidence also indicated that Schlegel had stable employment and was doing her best to provide a stable life for her children, including purchasing a home. Considering all of the evidence, the court's decision to grant Schlegel physical custody was not an abuse of discretion.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Lancaster County.

AFFIRMED.