766 N.W.2d 142 (2009)
17 Neb. App. 518
Martin L. COLEMAN, Appellant,
v.
Joni K. KAHLER, Appellee.
No. A-08-333.
Court of Appeals of Nebraska.
April 14, 2009.
*144 Christopher A. Furches, of Johnson, Flodman, Guenzel & Widger, Lincoln, for appellant.
Stephanie Payne, of Payne Law, P.C., L.L.O., Lincoln, for appellee.
INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.
CASSEL, Judge.

INTRODUCTION
Martin L. Coleman appeals from a declaratory judgment granting relief determining him to be the father of Joni K. Kahler's son, but awarding Kahler custody of the parties' minor children and allowing her to remove the children from Nebraska. We hold that Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior *145 adjudication addressing child custody or parenting time. Because we find no abuse of discretion by the district court, we affirm its judgment.

BACKGROUND
The parties, who never married, are the biological parents of two children: a daughter, born in 1992, and a son, born in 2002. In May 1993, a consent decree established Coleman's paternity to the parties' daughter and ordered him to pay child support, but it did not address custody or visitation rights. In February 2003, Coleman filed an acknowledgment of paternity concerning the parties' son, but there was no judicial determination of his paternity.
On October 5, 2007, Coleman filed his complaint for declaratory judgment. He sought an order establishing his paternity to the parties' son, establishing the parties' custodial and visitation rights with respect to both children, establishing child support obligations over the son, and prohibiting Kahler from removing the children from Nebraska.
Coleman also sought temporary custody of the children or, in the alternative, an order compelling Kahler to return the children to Nebraska during the pendency of the proceedings. After a hearing, the court denied Coleman's motion. The court stated:
[T]his is not a case in which a custodial parent has filed a request seeking permission to remove the children from the jurisdiction of the court. The reason [Kahler] made no such request before moving or contemplating moving the children to Ohio is because there has been no judicial custody determination made concerning either of the children (i.e., neither party has previously sought to have a court address custody and parenting time-related issues). The court considers this to be a significant factor in addressing [Coleman's] alternative request that [Kahler] be ordered to return the children to Nebraska.
On March 4 and 5, 2008, the court conducted a trial on Coleman's complaint. In the interest of brevity, we summarize the detailed evidence regarding Coleman's visitation with the children. Coleman moved to Georgia after Kahler became pregnant with the parties' daughter. In November 1992, when the child was approximately 7 months old, Coleman returned to Nebraska and lived with Kahler and their daughter for approximately 1 to 2 months. Between 1993 and 1995, the parties both lived in Lincoln, Nebraska, and Coleman's mother provided daycare for the child. Kahler testified that Coleman saw the child approximately 20 times at Coleman's mother's house. Coleman testified that he did not see the child on a regular basis but saw her at least once every 2 weeks.
In 1997, Kahler married and moved with her husband and the parties' daughter to Kansas City, Missouri. Coleman initially had visitation every other weekend, but that became less frequent, and he also had summer visitation of 4 to 6 weeks, broken into 1- or 2-week periods. Kahler and her husband separated in 1999, and a decree dissolved Kahler's marriage in 2003. From 1999 to 2001, Kahler lived in Kansas City with the parties' daughter; Kahler's "partner," Kimberly S.; and Kimberly's son. During that time, Coleman visited the parties' daughter a couple of times a year.
In the fall of 2001, Kahler and the parties' daughter returned to Lincoln, along with Kimberly and her son. Coleman visited the parties' daughter on weekends.
In late 2001, the parties discussed having a second child, but Kahler wanted *146 Coleman to impregnate Kimberly. Ultimately, Kahler became pregnant with the parties' son. Kahler testified that the agreement with Coleman was that their son would be raised by Kahler and Kimberly, that Kahler and Kimberly would have full financial responsibility and custody, and that Coleman could be part of the child's life if Coleman wished. Coleman testified that although he had not been ordered to pay child support for the parties' son, he gave Kahler $500 to $1,000 once their son was born and provided financial support in the form of clothes and toys and by paying certain bills.
Kahler testified that once their son was born, Coleman usually saw him at least once a week. Coleman testified that he regularly had visitation with both of the parties' children in Kahler's home, but Kahler testified that Coleman's regular visits with the children began in 2005 and that he did not have much involvement with them prior to that time. When the parties' son was 1 or 2 years old, their children began having overnight weekend visits at Coleman's home every other weekend in addition to visits with Coleman at Kahler's house on Wednesday and Sunday nights.
In 2007, Coleman's visitation with the children varied, but it generally included Sundays and Wednesdays and every other weekend from Saturday night to Sunday night. Sometimes Coleman would keep the parties' son from Wednesday to Friday night, and at times, the parties' son stayed with Coleman from Wednesday night to Sunday.
The parties had an amicable relationship. Some of Coleman's visits were as a family unit with Kahler and Kimberly along with Coleman and his wife, whom Coleman married in July 2007. Kimberly's teenage son lived with the Colemans for nearly a year, beginning in November 2006. Coleman testified that Kimberly's son's behavior and schoolwork improved the longer the child lived with the Colemans.
Coleman testified that he and Kahler shared the responsibility of taking their children to the doctor and dentist. They both disciplined the children. Coleman testified that Kahler remarked on several occasions he was more of a disciplinarian than she, but Kahler disagreed. Coleman testified that the parties' daughter had behavioral problems when she began high school and that Kahler requested his assistance in helping deal with issues such as poor grades, not completing homework, sneaking out of the house, and having friends stop by the house when no adults were present. Coleman's wife testified that the parties' daughter confided in her about sex-related issues, but Kahler testified that she had discussed such issues in detail with the parties' daughter multiple times.
On September 5, 2007, Kahler learned that her job as a broadband support technician would be eliminated and that her employer's broadband support division would be relocated to Ohio. Kimberly worked for the same company. At that time, Kahler earned close to $13 an hour and approximately $26,000 a year. Kahler testified that a position which she had applied for and accepted with the same company in Ohio would pay $16.30 an hour, or $33,900 a year, with an opportunity for advancement. The position also offered health care for Kahler and the children. Kahler testified that the company had two positions open in Nebraska at that time but that neither was in her field. She testified that she inquired about employment with a cellular telephone company in Lincoln and with a computer-payment-processing firm in Omaha, Nebraska, and checked a Web site with a Nebraska employment *147 database, but that she did not apply for any positions, "[b]ecause they were all really low, low pay."
Kahler discussed with Coleman a potential out-of-state move due to the outsourcing of her job and that of Kimberly. Kahler told Coleman that she and Kimberly would not accept positions in Ohio if Coleman did not want the children to move. Coleman testified that he told Kahler he did not want the parties' children moved from Nebraska, but that Kahler accepted the job in Ohio anyway. Kahler testified that at some point, Coleman agreed to allow her to move the children to Ohio, saying, "`I don't like it, but you have to do what you have to do."' Kahler testified that on the following day, she and Kimberly signed paperwork to accept the positions in Ohio. According to Kahler, Coleman later sent Kahler an e-mail that said only, "`I've sold my soul,"' which Kahler understood to mean that Coleman had changed his mind about agreeing to the move.
Coleman then initiated this action. After Kahler was served with the complaint, she told Coleman that he would never see the parties' children again. While Kahler admitted making the threat in anger, she claimed that she immediately sent Coleman an e-mail apologizing for having done so. Coleman testified that he then had problems exercising visitation and that Kahler sent an e-mail informing him that he had to provide 24-hour notice of any visitation and that all visits would be supervised. Kahler testified that she told Coleman that a visit needed to be supervised on one occasion, which was the visit right before the move to Ohio.
The children moved with Kahler to Ohio on October 23, 2007. From that time to the time of trial, Coleman had telephone communications with the children on Wednesday and Sunday nights, one Web camera visit, and 2 weeks' visitation over Christmas. Coleman testified that the parties' daughter spends approximately 2 to 5 minutes on the telephone with him. His access to the children had been "[e]xtremely limited," and he feared that the parties' son will "grow away" from him. Coleman testified that it would cost roughly $500 to drive to and from Ohio and that the average cost for an airplane ticket was around $350. Coleman described his relationship with the parties' daughter prior to the move as very close and very loving. Kahler, however, testified that Coleman's relationship with their daughter did not seem to be a close relationship. Coleman testified that their daughter had been pretty distant since the move. He described his relationship with Kahler and Kimberly as strained.
On March 11, 2008, the court entered an order finding Coleman to be the biological father of the parties' son. The court found it was in their children's best interests that custody of both be awarded to Kahler. The court ordered Coleman to pay $513.85 per month in child support for the parties' son. With regard to removal from Nebraska, the court addressed some of the issues set out in Wild v. Wild, 15 Neb.App. 717, 737 N.W.2d 882 (2007), and after doing so, it gave Kahler permission to remove the children to Ohio.
Coleman timely appeals.

ASSIGNMENTS OF ERROR
Coleman assigns three errors. First, he alleges that the district court deprived him of a substantial right and a just result by granting Kahler temporary permission to remove the parties' children from the jurisdiction. Second, he contends that the court abused its discretion by granting Kahler permission to remove the children permanently from the jurisdiction. Finally, Coleman assigns that the court *148 abused its discretion by denying his request for custody.

STANDARD OF REVIEW
An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. City of Ashland v. Ashland Salvage, 271 Neb. 362, 711 N.W.2d 861 (2006).
While a paternity action is one at law, the award of child support in such an action is equitable in nature. State on behalf of Kayla T. v. Risinger, 273 Neb. 694, 731 N.W.2d 892 (2007).
In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. State on behalf of Pathammavong v. Pathammavong, 268 Neb. 1, 679 N.W.2d 749 (2004).

ANALYSIS

Temporary Order.
Coleman argues that the district court deprived him of a substantial right and a just result by granting Kahler temporary permission to remove the minor children from the jurisdiction. We recognize that trial courts are discouraged from granting temporary permission to remove children to another jurisdiction prior to a ruling on permanent removal. See, Jack v. Clinton, 259 Neb. 198, 609 N.W.2d 328 (2000); Wild v. Wild, 15 Neb.App. 717, 737 N.W.2d 882 (2007). Here, the court did not affirmatively grant Kahler permission to remove the children, but, rather, denied Coleman's request for temporary custody of the children or for an order compelling Kahler to return the children to Nebraska. In any event, even assuming without deciding that the court's order was an abuse of discretion, we cannot afford relief to Coleman from the court's ruling on a temporary order. See Wild v. Wild, supra.
A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. State on behalf of Pathammavong v. Pathammavong, supra. The issue of whether the order denying Coleman's request for temporary custody was proper was relevant only from the time it was entered until it was replaced by the order determining the children's permanent custody. Accordingly, any issue relating to the temporary order is moot and need not be resolved in this appeal. See id.

Permanent Removal and Custody.
Coleman argues that the court abused its discretion by not awarding him custody and by allowing Kahler to remove the children from Nebraska because Kahler did not meet the test set forth in Farnsworth v. Farnsworth, 257 Neb. 242, 597 N.W.2d 592 (1999). Kahler argues that the Farnsworth test is inapplicable.
The Nebraska Supreme Court has held that before a custodial parent can remove a child from the state, permission of the court is required, whether or not there is a travel restriction placed on the custodial parent. State ex rel. Reitz v. Ringer, 244 Neb. 976, 510 N.W.2d 294 (1994), overruled on other grounds, Cross v. Perreten, 257 Neb. 776, 600 N.W.2d 780 (1999). Our review of removal jurisprudence in Nebraska involving children born *149 in and out of wedlock reveals a common element: a prior child custody determination. See, e.g., Tremain v. Tremain, 264 Neb. 328, 646 N.W.2d 661 (2002); Vogel v. Vogel, 262 Neb. 1030, 637 N.W.2d 611 (2002); Brown v. Brown, 260 Neb. 954, 621 N.W.2d 70 (2000); Jack v. Clinton, supra; Kalkowski v. Kalkowski, 258 Neb. 1035, 607 N.W.2d 517 (2000); Farnsworth v. Farnsworth, supra; State ex rel. Reitz v. Ringer, supra; Wild v. Wild, supra; Gartner v. Hume, 12 Neb.App. 741, 686 N.W.2d 58 (2004).
Under the Uniform Child Custody Jurisdiction and Enforcement Act, a "child custody determination" is defined to mean "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order." Neb.Rev.Stat. § 43-1227(3) (Reissue 2008). A child custody determination does not include an order relating to child support or other monetary obligation of an individual. Id. Under the above definition, before Coleman commenced the instant proceeding, there had been no child custody determination in this case with regard to either child.
Coleman argues that a custody determination has already been made because an unwed mother is initially entitled to automatic custody. But the Nebraska Supreme Court implicitly rejected that argument in State on behalf of Pathammavong v. Pathammavong, 268 Neb. 1, 8, 679 N.W.2d 749, 756 (2004), when it stated that the custody issue before it was a matter of initial judicial determination after reciting the propositionthe same one upon which Coleman reliesthat "[w]hile an unwed mother is initially entitled to automatic custody of the child, the issue must ultimately be resolved on the basis of the fitness of the parents and the best interests of the child."
Pathammavong merits further discussion, although the general factual background is not squarely on point with the situation at hand. In Pathammavong, like in the instant case, paternity proceedings were instituted in Nebraska concerning a child born out of wedlock. In Pathammavong, however, the parties lived together in Nebraska and in Texas before the mother returned to Nebraska with the child while the father remained in Texas. Subsequently, the father sought temporary and permanent child custody. The court granted the father temporary custody and, following a hearing, determined that the child should remain in the father's permanent custody. On appeal, the mother argued that the test set forth in Farnsworth v. Farnsworth, 257 Neb. 242, 597 N.W.2d 592 (1999), was applicable. The Pathammavong court observed that unlike Farnsworth, the case presented did not concern parental relocation or the modification of a previous court-ordered custody agreement, and that the order on appeal was the first court order assigning custody to a parent. The Pathammavong court determined that the district court was not required to apply the Farnsworth test, explaining:
The issue before the district court was not whether one or the other of the parents was free to relocate with the child, but, rather, which parent should be awarded permanent custody of [the child] as a matter of initial judicial determination. This question must be resolved on the basis of the fitness of the parents and the best interests of the child.
268 Neb. at 6, 679 N.W.2d at 755.
Like in Pathammavong, the order on appeal in the instant case is the first court order awarding custody of either child and there had been no request for parental *150 relocation. A significant distinction, however, is that in Pathammavong, the father was already in Texas at the time of his filings, whereas here, Kahler completed her move to Ohio after Coleman filed his complaint but before the court heard it. Nonetheless, we find guidance in the court's reasoning.
Similarly, the Nebraska Supreme Court conducted no removal analysis in State ex rel. Grape v. Zach, 247 Neb. 29, 524 N.W.2d 788 (1994). In that case, pursuant to a 1989 filiation proceeding, a Nebraska district court adjudged the respondent as the child's father and ordered him to pay child support. Shortly after June 1990, the mother and the child moved to New York. In early 1992, the mother returned to Nebraska. In March, she filed a motion for custody of the child and the court entered an ex parte order granting her custody. The father filed a "'Motion to Set Aside Order, for Temporary Custody, and for Order Prohibiting [Mother] from Removing Child from State.'" Id. at 33, 524 N.W.2d at 795. The court set aside its ex parte order, granted the father temporary custody, and ordered that the child not be removed from Nebraska. The mother and child returned to New York. The father filed the temporary custody order in New York and brought the child back to Nebraska. Following the sustaining of the mother's demurrer to the father's above-mentioned motion, the father filed an application for temporary and permanent custody of the child. The court held a hearing and, on April 29, 1993, entered an order placing permanent custody of the child with the father.
On appeal, the State ex rel. Grape court stated that no court had made a custody determination until the April 29, 1993, order. The court stated that in a filiation proceeding in which paternity had been admitted and the natural father had demonstrated a familial relationship with the child and fulfilled his parental responsibilities of support and maintenance, the fact that the child was born out of wedlock was to be disregarded and custody determined on the basis of the child's best interests. In so doing, the Nebraska Supreme Court determined that the district court did not abuse its discretion in awarding custody to the father.
Based on State on behalf of Pathammavong v. Pathammavong, 268 Neb. 1, 679 N.W.2d 749 (2004), and State ex rel. Grape v. Zach, supra, we hold that Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time. But like we stated in a case where the children's coguardians filed a motion to remove the children to Texas, "if the instant case is determined by the children's best interests, then we can conceive of no good reason why Farnsworth [v. Farnsworth, 257 Neb. 242, 597 N.W.2d 592 (1999),] would not be properly included in the analytical framework to determine the children's best interests." In re Interest of Eric O. & Shane O., 9 Neb.App. 676, 684, 617 N.W.2d 824, 831 (2000). Accordingly, we give some consideration to the Farnsworth factors in determining custody based on the children's best interests.
Farnsworth enunciated three broad considerations in considering whether removal is in the children's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact such a move will have on contact between the children and the noncustodial parent, when viewed in the light of reasonable visitation.
The parties' children, ages 15 and 5 at the time of trial, have always primarily *151 resided with Kahler, and Coleman did not seek placement of the children with him until he learned of Kahler's plans to move. Kahler wished to move because her position had been outsourced to Ohio and her job search did not uncover employment in Nebraska with pay comparable to what she had been earning. The evidence established that Kahler's pay in Ohio would be greater, as would Kimberly's pay. Coleman opposed the move because of the adverse impact it will have on his visitation and his ability to foster a relationship with the children. Unfortunately, Kahler's plans to move with the children created hostilities between the parties. Up until that time, the parties and their significant others interacted together as a family unit. Afterward, their relationship became strained.
The move to Ohio brought improved housing conditions for Kahler. In Lincoln, she rented a three-bedroom house with just over 1,000 square feet for $600 a month. The parties' son shared a room with Kimberly's son. Kahler testified that the house was not in good shape, that it had many cracks in the walls, that she had problems with pests, and that it was expensive to heat and cool. On the other hand, the house in Ohio has four bedrooms, has 2,400 square feet, and costs $1,000 a month to rent. Kahler testified that the Ohio house is very clean and well kept and that her utility bills are less expensive.
The parties did not adduce much evidence regarding educational advantages in one state versus the other. Kahler testified that she felt the Ohio schools were better and safer and that the schools were near to the Ohio house. The parties' son attended a full-day kindergarten in Lincoln, but only a half-day kindergarten in Ohio. Kahler testified that the parties' daughter's grades had improved since the move.
The parties have no family in Ohio, whereas they have numerous family members in Nebraska. Kahler's brother lives in Lincoln, and Coleman's family members residing in the Lincoln area include his parents, two brothers, a sister, four cousins, an aunt, and an uncle. Coleman testified that the parties' children have a relationship with those family members and that they would get together with the children on holidays, birthdays, and anniversaries. Coleman's mother testified that the children's move to Ohio had interfered with her relationship with them because she rarely is able to see them. Coleman's sister, who saw the children at least once a week up until 2004, testified that she had a close relationship with the parties' daughter and that since the move, she has communicated with the parties' daughter by sending messages through a Web site.
We conclude that the children's best interests are served by being in Kahler's custody. The children are bonded to both parties, but it appears that they have a stronger bond with Kahler. Aside from overnight visitations with Coleman in the past few years, the children have always lived with Kahler, and she has been the parent primarily responsible for the daily tasks involved in raising the children. Coleman testified that Kahler is a good mother. Because the children's best interests dictate that they remain with Kahler, we find no abuse of discretion by the district court in awarding Kahler custody and allowing her to remove the children to Ohio.

Attorney Fees.
Kahler filed a motion with this court requesting an award of attorney fees in this appeal. In support of Kahler's motion, she attached the affidavit of her counsel which stated that she charged *152 Kahler $3,442.50 in attorney fees, based upon counsel's hourly rate of $135.
As a general rule, attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. Young v. Midwest Fam. Mut. Ins. Co., 276 Neb. 206, 753 N.W.2d 778 (2008). Attorney fees and costs are statutorily allowed in paternity and child support cases. See, Neb. Rev.Stat. § 43-1412(3) (Reissue 2008); Cross v. Perreten, 257 Neb. 776, 600 N.W.2d 780 (1999). Further, under the Uniform Child Custody Jurisdiction and Enforcement Act, "[t]he court shall award the prevailing party ... attorney's fees... unless the party from whom fees or expenses are sought establishes that the award would be clearly inappropriate." Neb.Rev.Stat. § 43-1259(a) (Reissue 2008).
Customarily, attorney fees and costs are awarded only to the prevailing party or assessed against those who file frivolous suits. See Noonan v. Noonan, 261 Neb. 552, 624 N.W.2d 314 (2001). Clearly, Kahler was the prevailing party in this case. The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. Finney v. Finney, 273 Neb. 436, 730 N.W.2d 351 (2007). We award Kahler an attorney fee of $1,500 for her attorney's services on appeal.

CONCLUSION
We do not consider Coleman's assignment of error regarding the temporary order, because that issue is moot. We conclude that the district court did not err in awarding custody of the children to Kahler and allowing the children to remain with her in Ohio. We sustain Kahler's motion for attorney fees for services in this court and allow a fee in the amount of $1,500.
Affirmed.