IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE ON BEHALF OF ANYA S. & JAYDA S. V. XAVIER D.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA ON BEHALF OF ANYA S. AND JAYDA S., MINOR CHILDREN, APPELLEE,

v.

XAVIER D., DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLEE,
AND AMANDA S., THIRD-PARTY DEFENDANT, APPELLANT.


Filed October 1, 2019.    No. A-18-1150.


Appeal from the District Court for Douglas County: JAMES T. GLEASON, Judge. Reversed and remanded with directions.

Steven M. Delaney and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellant.

Xavier D., pro se.

No appearance for appellee State of Nebraska.


MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Amanda S. appeals the Douglas County District Court's order granting joint legal and physical custody of minor children Anya S. and Jayda S. to herself and their father, Xavier D. For the reasons set forth here, we reverse and remand for further proceedings.

## II. STATEMENT OF FACTS

Due to the lengthy procedural history of this case, we focus only on the portion relevant to this appeal. Xavier and Amanda, who never married, are the parents of two girls--Anya, born in

June 2008, and Jayda, born in June 2013. As a result of a paternity action, Xavier was ordered to pay $730 per month in child support for both children and Amanda was ordered to provide health insurance for the children. The original paternity decree reserved ruling on the issues of child custody and visitation.

Subsequently, Xavier filed an amended complaint to modify and later filed a motion and amended motion for temporary custody and visitation. A temporary order was entered in December 2016, awarding Xavier parenting time. Xavier then filed a motion for parenting time and custody outlining the actions he had taken to see his children. An amended temporary order was entered in August 2017 ordering parenting time for Xavier and counseling for the parties. In December 2017, Xavier filed a motion to modify the temporary order concerning parenting time. In June 2018, Xavier filed a motion to modify child support. The court held a hearing on June 29 governing all outstanding issues. During the hearing, testimony centered on Xavier's request for custody, Amanda's resistance to Xavier's request to increase parenting time, and a therapist's opinion that Xavier's parenting time with the children should not be increased is documented more fully below.

1. XAVIER'S TESTIMONY

Xavier's testimony focused on his previous efforts to visit his children and his basis for seeking additional time with them. He explained that the original paternity decree did not specify parenting time and that his previous parenting time involved coordination with Amanda. Xavier testified that, after he and Amanda separated in 2013, he visited his children every weekend for a year, but that Amanda would only allow these visits to take place at her residence. As a result, in order to obtain additional time, Xavier testified that he filed for a modification. When Xavier was asked how much parenting time he should be awarded, Xavier explained that he was not trying to obtain joint custody, then offered his proposed parenting plan which gave him the children Wednesday to Friday one week and then Thursday to Monday morning the following week. Xavier's proposed parenting plan also alternated holidays, rather than splitting time between Xavier and Amanda each holiday because that arrangement had previously led to conflicts. Xavier ultimately testified he wanted more time with his children because he loves them, they love being with him, and they need their father.

During cross-examination, Xavier acknowledged that, in a prior hearing, he had been ordered to undergo a psychological evaluation. Xavier further acknowledged undergoing the evaluation and that the treating psychologist recommended he attend cognitive behavior therapy to reduce his irritability by learning certain skills and learning to process his negative emotions. Xavier testified he attended cognitive behavioral therapy but did not provide any corroborating records of such attendance. Xavier was then asked about the court's August 2017 temporary order that required him to participate in family therapy with Anya and Dr. Cottam. The evidence reflected that he attended three sessions with Dr. Cottam. Xavier also acknowledged that he had not attended therapy sessions with Anya and mental health practitioner April Blevins. In that regard, Xavier testified he attempted to contact Blevins three times but that he never received a response.

Xavier was also questioned about his child support delinquency. A certified copy of a document from the Department of Health and Human Services (DHHS) was received by the

district court showing Xavier owed $849.47 in child support. However, Xavier disputed being delinquent saying the amounts shown on the document were wrong and were caused by a DHHS mistake.

### 2. AMANDA'S TESTIMONY

Amanda testified she is the mother of Anya and Jayda and has taken care of the children since their births. She testified that she has worked as a client service analyst at First Data for 3½ years, and prior to that she was employed as a social worker. Amanda testified that, after their separation, Xavier did not have regular contact with the children until he filed the paternity action. Amanda testified the original paternity decree did not create an obligation for daycare expenses. Amanda testified she has the children covered under her health insurance and that Xavier has not contributed to the daycare costs or the children's uncovered medical expenses.

When describing Anya, Amanda stated she is bubbly, loves school, and that dance is her life. Anya dances 5 to 6 days per week participating in regular dance classes and competitive dance, all paid for by Amanda. Amanda testified that Anya is very athletic and used to participate in swimming and sports offered at the YMCA but stopped these activities due to her busy dance schedule. Amanda also stated that Anya has also participated in Girl Scouts and Amanda was one of her troop leaders.

Amanda described Jayda as a good listener and good student. She testified that shortly before the hearing, Jayda received an award from her preschool for her behavior and for doing well in school. Amanda stated that Jayda participated in swimming and sports offered through the YMCA. However, Amanda testified Xavier was not taking Jayda to swimming lessons or he would take her but she would refuse to swim so they would leave. Amanda later testified that Xavier texted her from the swimming lesson that Jayda refused to swim. Amanda testified she was paying for swimming lessons that Jayda was not always attending, so she decided to stop swimming lessons.

Regarding the structure in her home, Amanda testified there are chores, consequences, and not much television. She stated that Anya timely finishes her homework and reads. Bedtime is usually around 8 or 8:30 p.m. unless an activity goes later. Amanda also testified to her involvement with Pinewood Elementary, the school both girls attend, explaining she is the president of the PTA, attends the Valentine's Day parties and Halloween Parties, and prioritizes attending special events. Amanda testified Xavier also joined the PTA the year prior to the hearing. Amanda testified her relationship with the children is fine, they have fun together, and spend a lot of time with each other.

Amanda testified to the conflict between herself and Xavier. For example, when Amanda informs Xavier of events, he responds with accusatory questions, or if Amanda does not reply to Xavier immediately, she receives emails from Xavier threatening to question her on the stand in court. She explained that she and Xavier previously utilized a shared calendar in order to coordinate the children's activities, which made it easy to inform Xavier of events because it was on the calendar and they did not have to communicate; however, the calendar system did not last long because Xavier later refused to use it. Amanda also testified that conflict arose when she would add an event. For example, she testified to one occasion where she added a friend's birthday party on a day when Xavier had the children. Xavier felt that he had to take time from his visitation

with the children to take them to the birthday party because Amanda had already told the children that they could attend the party.

Amanda testified that she encourages the children to have fun with Xavier but to also behave. She testified that she wants the children to have a good relationship with Xavier. Despite this, Amanda testified Anya yells, screams, and slams doors in Amanda's face on the days Xavier is supposed to take the children. Amanda testified she hopes Anya can work through her emotions and tell Xavier how she feels. Amanda testified she thinks therapy with Anya and Xavier will help alleviate the problems. Amanda testified that Anya has told her Anya lies to Dr. Cottam because she is unsure what rectification will occur, despite Amanda's insistence that she tell the truth. Amanda clarified that, specifically, Anya told her Anya lies in family therapy about trusting Xavier when she actually does not trust him. Amanda testified that Anya feels she will get in trouble if she tells Xavier how she feels.

Amanda offered a proposed parenting plan that changed the days Xavier would see the children but kept the amount of time with them the same. Amanda testified that she has known Xavier for close to 20 years and he has never been physically abusive with her or the children. However, Amanda testified she is concerned about harm caused by Xavier through mental abuse. Amanda testified she initiated counseling for Anya with April Blevins after Anya reported being afraid of Xavier while being left with Xavier for his parenting time. Anya reported being afraid due to her concern that Xavier was "going to take her and lock her in a dungeon to keep her away" from Amanda. Amanda further testified that if Anya did not know where she and Xavier were going or if it was a surprise, Anya feared she was going to be locked in a dungeon. Amanda also recounted another incident involving Anya's fears and explained when Anya looks at Xavier, "she sees a knife in his hand and he's telling her he's going to kill her family."

### 3. APRIL BLEVINS' TESTIMONY

Blevins is a licensed mental health practitioner who has worked with Anya in individual therapy since January 2017. Blevins testified Anya was originally referred to her for anxiety that she experienced at school. However, Blevins testified that, while working with Anya to overcome her anxiety, she ultimately concluded the source of Anya's anxiety was her visits with Xavier. Blevins described Anya as, "a very bubbly, very smart, articulate little girl" who is intellectually more advanced than other 9-year-old children. She further testified Anya is more emotionally advanced because she understands where her emotions are coming from, she feeds off other people's emotions, and she is intuitive. Blevins testified Anya has a large vocabulary and can articulate her words very well. Blevins testified she is working with Anya to improve her ability to communicate with Xavier. Blevins testified she has concerns regarding Anya's anxiety following visitations with Xavier and explained that Anya had visions of Xavier hurting her, Jayda, and Amanda. Blevins also explained Anya would hide at various times during visits and, at times, she was unable to focus at school. When asked whether Anya expressed concerns about Amanda, Blevins testified that Anya expressed she does not like getting in trouble and being disciplined.

Blevins testified about family therapy sessions Anya attended with Xavier and Dr. Cottam. She opined that the therapeutic needs of Anya and Xavier could not be fully assessed during family therapy sessions because Anya had not opened up and that discussions which had occurred were very superficial. Blevins testified that Xavier only attended three family therapy sessions. Blevins

also testified that Anya expressed she lied in a lot of those sessions, held in her feelings, and did not divulge how she truly feels.

Blevins acknowledged that Xavier had filed a formal grievance directed at her with the State of Nebraska. She explained that, in his grievance, Xavier cited ethical concerns due to her not returning Xavier's phone calls, Blevins' alleged demeanor with Anya and Amanda in the courthouse hallway, and requested Blevins' removal as Anya's therapist. Blevins testified she did not respond to Xavier's phone calls because he left very aggressive and demeaning messages. Instead, Blevins stated she limited her contacts with Xavier but did contact Xavier's attorney. Blevins further testified that she was never removed from Anya's case and never received a court order to stop working with Anya.

Blevins ultimately testified that, in her professional opinion, no additional parenting time should be given to Xavier because it would be contrary to Anya's best interests and mental health. She explained that Anya still deals with anxiety and that, despite family therapy starting around January 2018, problems and concerns still exist that have not been resolved. She explained family therapy is necessary to establish a base relationship between Anya and Xavier.

### 4. DISTRICT COURT'S ORDER

In November 2018, the district court modified the paternity decree finding that "there have been material and substantial changes in circumstances which have occurred between the parties and the minor children and therefore the Decree of Paternity requires modification as set forth hereinafter." The court awarded the parties joint legal and physical custody of both children with possession of the children to be alternated between the parties on a week-on, week-off basis. The court also ordered, among other things, Amanda to pay 57 percent of the child support costs and Xavier to pay 43 percent of the costs and ordered Amanda to pay $750 for Xavier's attorney fees.

Following that order, Amanda filed a motion to alter or amend a paragraph in the court's order relating to child support so as to comply with Neb. Ct. R. § 4-212 and to amend the award of attorney fees. The district court granted, in part, the motion to alter or amend regarding the portion of the court's order governing the children's expenses and ordered the parties to pay for all reasonable and necessary direct expenditures for the children including clothing and extracurricular activities with 43 percent of the costs allocated to Xavier and the remaining 57 percent allocated to Amanda. The district court denied the request to amend the award of attorney fees. Amanda appealed.

### III. ASSIGNMENTS OF ERROR

On appeal, Amanda assigns, restated, that the district court erred (1) in awarding the parties' joint legal and physical custody; (2) in awarding attorney fees to Xavier, who appeared as a pro se litigant; and (3) in denying part of her motion to alter or amend.

### IV. STANDARD OF REVIEW

Child custody determinations are initially entrusted to the discretion of the trial court. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). An appellate court reviews child custody determinations de novo on the record, and affirms the trial court absent an abuse of discretion. *Id*.

## V. ANALYSIS

### 1. AWARD OF JOINT LEGAL AND PHYSICAL CUSTODY

Many of Amanda's assignments of error can be consolidated into the following question: Did the district court err in awarding the parties joint legal and physical custody? In making its award, the court analyzed the issue of custody as one of modification. Amanda argues, in part, that the court stated during the custody hearing that the case would be analyzed as an initial custody determination but, in its order, the court improperly analyzed the custody issue as one of modification. We hold that the court erred in analyzing the custody issue as one of modification rather than one of initial custody.

Here, the original paternity decree expressly stated that it was reserving ruling on child custody and visitation. Although Amanda took automatic custody of the children following their births, Amanda's custody of the minor children as their unwed mother does not constitute a custody determination. See *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009) (noting that even though unwed mother is initially given automatic custody, issue must ultimately be resolved on fitness of parents and best interests of child). Thus, we agree with Amanda that since the original paternity decree did not establish custody, the district court should have conducted an initial determination of custody rather than performing a modification analysis.

That said, the court's utilization of an improper analytical framework does not necessarily end our inquiry. "Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action." *Mann v. Rich*, 18 Neb. App. 849, 853, 794 N.W.2d 183, 187 (2011) (modification of custody in paternity action). Here, the court concluded that there was a material change in circumstances that warranted analyzing whether it was in the best interests to change custody. Although the court was not required to determine that a material change in circumstances occurred, the court ultimately engaged in a best interest analysis in making its custody determination.

The district court's determination that a change of circumstances occurred does not prejudice Amanda because that inquiry was not necessary to the proceeding. As such, the ultimate question here turns on whether the court properly concluded that Xavier and Amanda should share joint legal and physical custody. Stated differently, because Amanda assigns that the court incorrectly concluded she and Xavier should jointly share legal and physical custody, we must now perform a de novo review of the record to determine whether the court properly concluded that a joint custody arrangement is in the best interests of the minor children.

In undergoing this analysis, we first note that Amanda challenges the award of both legal and physical custody to the parties. Those concepts were recently defined by the Nebraska Supreme Court in *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 945-48, ___ N.W.2d ___, ___ (2019), and provides insight to the following issues now before us:

> "Legal custody" focuses entirely on decisionmaking authority and is defined as "the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health."
>
> . . . .

"Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." As such, although the Parenting Act does not speak in terms of "sole" or "primary" physical custody, it contemplates that an award of physical custody will determine the child's primary residence and identify the parent who will exert "significant" and "continuous" parenting time over the child.

"Joint physical custody" as defined by the Parenting Act means "mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." The Parenting Act does not further define either "significant periods of time" or "continuous blocks," but it does define "parenting time."

"Parenting time" is defined under the Parenting Act as "communication or time spent between the child and parent." And the Parenting Act makes clear that regardless of the physical custody arrangement, when parents are exercising parenting time, they are performing "[p]arenting functions." Parenting functions are defined to include maintaining a safe, stable, consistent, and nurturing relationship with the child; attending to the child's ongoing developmental needs, including feeding, clothing, grooming, emotional stability, and appropriate conflict resolution skills; attending to adequate education for the child; assisting the child in maintaining a safe, positive, and appropriate relationship with each parent and other family members; minimizing the child's exposure to harmful parental conflict; assisting the child in developing skills to maintain safe, positive, and appropriate interpersonal relationships; and exercising support for social, academic, athletic, or other special interests.

The Parenting Act does not require any particular parenting time schedule to accompany an award of either sole or joint physical custody, and there exists a broad continuum of possible parenting time schedules that can be in a child's best interests. . . .

. . . .

Where a parenting plan effectively establishes a joint physical custody arrangement, courts will so construe it, regardless of how prior decrees or court orders have characterized the arrangement. In several cases, we have looked past the labels used by the trial court when describing the physical custody arrangement and have focused instead on the actual terms of the parenting plan adopted by the court. Such cases illustrate that it is the trial court's allocation of parenting time that drives the physical custody label, not the other way around.

We therefore agree with the parties and the Court of Appeals that regardless of the label used in the decree and parenting plan to describe physical custody, the trial court here effectively imposed a joint physical custody arrangement by creating a week-on-week-off parenting time schedule.

We further note that in *State on behalf of Kaaden S.,* the Nebraska Supreme Court disapproved of the blanket proposition that joint custody arrangements are generally disfavored and should be reserved for rare or special cases. 303 Neb. at 955, ___ N.W.2d at ___. Specifically, the Supreme Court held that joint custody "is neither favored nor disfavored under Nebraska law."

*Id.* Rather, the Supreme Court emphasized that in determining custody, the court considers the best interests of the child.

> When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

> The Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests.

> In addition to considering these statutory factors, our case law instructs that when making determinations as to the allocation of parenting time that is in a child's best interests, a trial court should also consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. The fact that one parent might interfere with the other's relationship with the child is also a factor to consider, but is not a determinative factor.

> By reciting these factors, we do not suggest that each will be relevant in every case; nor do we imply that a court is prohibited from considering other factors not mentioned. No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. The one constant is that "[i]n any proceeding involving a child, the best interests of the child shall be the standard by which the court adjudicates and establishes . . . any custody, parenting time, visitation, or other access determinations as well as resolution of conflicts affecting each child."

*State on behalf of Kaaden S.,* 303 Neb. at 956-57, ___ N.W.2d at ___.

Against that framework, we must now perform a de novo review of the record in order to determine whether a joint legal and physical custody arrangement is warranted in the instant case. We first consider whether the court erred in awarding joint legal custody.

### (a) Award of Joint Legal Custody

As we previously stated, legal custody focuses on the parents' decisionmaking authority and is defined as "'the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health.'" *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 946, ___ N.W.2d ___, ___ (2019). Here, Amanda has had custody of both minor children since their births and has been the primary decision maker regarding the minor children's welfare. Further, the evidence reflects that Amanda and Xavier do not communicate well. We see nothing in the record which supports changing Amanda's long-time status as decision maker and the district court did not explain its rationale in ordering joint legal custody within the order. Based upon our de novo review of the record, we find that Amanda's

long-time successful role as decision maker in her children's lives, the difficulty Xavier and Amanda have in communicating, and based upon Xavier's own acknowledgement that he was not seeking joint custody, we find that it is in the children's best interests for Amanda to be awarded sole legal custody of Anya and Jayda.

### (b) Award of Joint Physical Custody

Next, we address the court's award of joint physical custody.

First, we note that although the original paternity decree was not a custody determination in Amanda's favor, the fact that the minor children have remained in Amanda's care since their birth is certainly a factor that can be considered by the court in determining custody and visitation. See *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012) (trial court did not abuse discretion in considering that child had remained under mother's care since birth and in awarding custody of child to mother in action to establish paternity and custody).

Second, our review of the record establishes that Amanda has a close and positive relationship with the children, she has provided for their basic needs, and she has nurtured their physical and social development by enrolling them in various activities such as sports, swimming lessons, Girl Scouts, and dance. Amanda has been actively involved in the children's lives by volunteering at the elementary school, serving as president of the PTA, and serving as a Girl Scout troop leader.

Third, we note that Xavier testified that he was not trying to obtain joint custody but simply desired to increase his parenting time with his children due to his love and affection for them. That said, we note Xavier attended three court-ordered family therapy sessions with Dr. Cottam, and Blevins testified that more therapy was needed in order to work through Anya's anxiety issues with Xavier. These issues appear to include Anya's visions of Xavier hurting her family and Anya's fears of Xavier keeping her away from her family. Blevins opined that, in her professional opinion, granting additional time to Xavier would be contrary to Anya's best interests and mental health. Further, Blevins expressed concern with Anya's continuing struggles with anxiety and inability to focus at school following visitations with Xavier despite family therapy to address these concerns.

Based upon our de novo review, we find that the district court abused its discretion in awarding the parties joint physical custody of the minor children. The record reflects that Amanda has been the primary caregiver for both of the children since their birth, a mental health practitioner testified that modifying custody would be contrary to Anya's best interests and mental health, and the order is even contrary to Xavier's own requests for parenting time made during his testimony to the court. Amanda has provided the children with a stable, loving home and provided them with an environment in which it appears they are thriving. The children's best interests lie in allowing them to remain in Amanda's legal and physical custody while allowing appropriately structured parenting time with Xavier.

### (c) Summary

In sum, the best interests of the children require that the court's order awarding joint legal and physical custody be reversed and the cause remanded with directions for the district court to enter an order granting legal and physical custody to Amanda with an award of reasonable

parenting time to Xavier. Additionally, on remand, the district court is ordered to determine child support and other associated issues.

## 2. ATTORNEY FEES

Amanda argues the district court erred in awarding attorney fees to Xavier, who was pro se at the time of the custody hearing. As a general rule, attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). Although attorney fees and costs are statutorily allowed in paternity and child support cases, customarily they are awarded only to the prevailing party or assessed against those who file frivolous suits. *Id*. Because we held the district court abused its discretion in awarding joint legal and physical custody, Xavier is not the prevailing party; thus, he is not entitled to attorney fees. Accordingly, we reverse and vacate the portion of the district court's order awarding Xavier attorney fees.

## 3. MOTION TO ALTER OR AMEND

Because we reverse and remand with directions to the district court, we do not need to address Amanda's last assigned error, i.e., that the district court erred in denying, in part, her motion to alter or amend. See *In re Henry B. Wilson, Jr., Revocable Trust*, 300 Neb. 455, 465, 915 N.W.2d 50, 57 (2018) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## VI. CONCLUSION

Based upon our de novo review, we find that the best interests of Anya and Jayda require that their legal and physical custody be awarded to Amanda subject to an award of reasonable parenting time to Xavier. We further find that the court's award of attorney fees to Xavier must be reversed. Accordingly, the order of the district court is reversed and the cause is remanded for entry of an order consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.