IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


KREIFELS V. AMBRIZ


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


NICHOLAS D. KREIFELS, APPELLANT,

V.

KATHRYN A. AMBRIZ, APPELLEE.


Filed May 17, 2022.    No. A-21-727.


Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

Steffanie J. Garner Kotik for appellant.

Megan E. McDowell, Alyson K. Ryan, and Jerrad R. Ahrens, of Cordell Law, L.L.P., for appellee.


MOORE, RIEDMANN, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Nicholas D. Kreifels appeals from an order entered by the district court for Lancaster County which granted the request of Kathryn A. Ambriz to modify an order of paternity and support entered on November 1, 2018. Such order of paternity and support awarded the parties joint legal custody of their son, Rayder. Kathryn was awarded sole physical custody of Rayder, but Nicholas had parenting time for 5 consecutive days out of every two weeks.

On appeal from the modification of the order of paternity and support, Nicholas argues that the district court erred in temporarily suspending his parenting time during the pendency of the modification action, in modifying the order of paternity and support to award Kathryn sole legal custody, in not modifying the order to award he and Kathryn joint physical custody, in failing to further reduce his monthly child support payments, and in awarding Kathryn $5,000 in attorney fees. For the reasons set forth herein, we affirm the modification order in its entirety.

- 1 -

## II. BACKGROUND

Nicholas and Kathryn are the parents of Rayder, born in June 2016. While the parties were never married, they were in a long-term romantic relationship beginning in 2013. They temporarily ended their relationship in 2018. In November 2018, the district court entered a decree of paternity and support, in which it accepted the parties' agreed upon parenting plan. As a part of this agreed upon parenting plan, Nicholas and Kathryn were to share joint legal custody of Rayder, while Kathryn was to have sole physical custody. Nicholas was to have parenting time with Rayder every other week from 4 on Tuesday afternoon to 4 on Sunday afternoon. Nicholas and Kathryn agreed that "the primary form of communication between them shall be in written electronic form through [an application referred to as] talkingparents.com." As part of the order of paternity and support, Nicholas was ordered to pay $868 per month in child support.

Shortly after the entry of the November 2018 order of paternity and support, the parties resumed their romantic relationship, staying together off and on through October 2019. In February 2020, Kathryn filed a complaint to modify the order of paternity and support. In the complaint, Kathryn alleged that there had been material and substantial changes in circumstances which warranted a modification to the order of paternity and support such that she be awarded sole legal custody of Rayder. Specifically, Kathryn alleged that the material and substantial changes included the deterioration of Nicholas' mental and physical health and the development of concerning behaviors by Nicholas which had called into question Rayder's safety when with Nicholas. In the complaint, Kathryn also requested that the district court modify Nicholas' child support obligation, order him to contribute to daycare and medical expenses for Rayder, and award her with attorney fees.

In addition to filing the complaint for modification, Kathryn simultaneously filed a motion for an ex parte order, requesting that the district court temporarily suspend Nicholas' parenting time with Rayder pending a hearing. In the motion, Kathryn alleged that Nicholas had "exhibited violent and concerning behaviors toward [Kathryn] and her family, friends, and coworkers" and that he had done so in the presence of Rayder. She also alleged that Nicholas may be using illegal drugs and alcohol, sometimes in the presence of Rayder. The district court entered an ex parte order temporarily suspending Nicholas' parenting time pending a hearing, which was scheduled for March 3, 2020, approximately 26 days from the entry of the ex parte order.

On February 27, 2020, five days before the scheduled hearing on the ex parte order, Nicholas filed a motion to vacate the ex parte order. The basis of his motion was the district court's failure to hold the hearing within ten days of the entry of the ex parte order. The district court, apparently, denied the motion to vacate, as the hearing on the ex parte order was held as scheduled on March 3, 2020.

After the hearing on the ex parte order, the district court entered a subsequent order which temporarily awarded sole legal and physical custody of Rayder to Kathryn pending the conclusion of the modification proceedings. Nicholas' parenting time was modified such that he was only permitted to have supervised parenting time with Rayder every Wednesday evening from 4:30 to 8 and every other weekend on Friday evening from 4:30 to 8, Saturday from 9 a.m. to 1 p.m., and Sunday from 9 a.m. to 1 p.m. Regarding the parties' communications with each other, the district

court stated: "[T]he only form of communication between [the parents] shall be in written electronic form through the Talking Parents app, except in the case of an emergency."

Nicholas filed an answer and a cross-complaint to Kathryn's complaint to modify. In his answer, he generally denied each of Kathryn's allegations. In his cross-complaint, he affirmatively requested that the order of paternity and support be modified to award the parties with joint physical custody of Rayder. He also asked that his child support obligation be modified and that he be awarded attorney fees.

On June 10, 2020, Nicholas filed a motion asking the court to reconsider its order awarding Nicholas only supervised visitation with Rayder pending the modification trial. Although the court's order ruling on Nicholas' motion is not included in our record, the district court's modification order does reflect that on June 19, the court entered an order awarding Nicholas unsupervised parenting time every Wednesday evening from 4:30 to 8 and every other weekend from Friday at 4:30 p.m. to Saturday at 6 p.m. and Sunday from 9 a.m. to 6 p.m. The court noted its findings that since the entry of the temporary order awarding Nicholas only supervised parenting time, Nicholas "continue[d] to have negative communications with [Kathryn] and [was] encouraged, again, to discontinue those for the benefit of Rayder."

The modification trial began on March 19, 2021, and continued on April 29. At the trial, both Nicholas and Kathryn testified as to their relationship with each other and with Rayder and their current circumstances. In addition, Kathryn called her mother to testify on her behalf and Nicholas called the person who supervised visits between him and Rayder to testify on his behalf.

Kathryn testified about her relationship with Nicholas. She explained that they initially started dating in 2013 and that they remained together through and after Rayder's birth in June 2016. However, the relationship ended in April 2018 when she moved out of their home. They resumed their relationship in January 2019, a few months after the order of paternity and support had been entered. In the months following January 2019, Nicholas often stayed with Kathryn at her home. In addition, they took a family vacation together during that summer. Kathryn testified that their relationship ended again in October. However, Nicholas did stay with her again for a few days in January 2020.

After they had resumed their relationship in January 2019, Nicholas told Kathryn that he had regularly used methamphetamine in 2018, presumably after their first breakup. In addition, after January 2019, Kathryn observed that Nicholas had begun to drink alcohol again. In fact, Nicholas was charged with driving under the influence in April. Kathryn also testified that during 2019, Nicholas was struggling with mental health problems, including increasingly erratic behavior and threats of suicide.

Currently, Kathryn resides in a three-bedroom home with Rayder and her 13-year-old daughter from a prior relationship, whom she has custody of. Rayder has his own room in the home. Kathryn is employed as a staff assistant at the Nebraska Department of Transportation. She works 40 hours per week and earns $18 per hour. Her annual income totals approximately $31,600. When Kathryn is at work, Rayder attends a preschool program and Kathryn's mother provides any other necessary child care. Occasionally, Kathryn's daughter, who gets along "really well" with Rayder, also helps to watch him.

Kathryn described Rayder as a "funny" and "wild" child who "loves to be outdoors, loves to play sports, [and] ride his bike." She testified that she is typically the one who takes Rayder to

his medical and dental appointments and has been the parent who has signed him up for activities. Kathryn also plays with Rayder regularly, cooks meals for him, bathes him, buys him clothes, and takes him on vacations and to special events. Kathryn expressed concern that recently, Rayder has begun to display some anger and aggressive behavior. She explained that she believes that Rayder is learning this behavior from Nicholas.

Kathryn testified extensively about her concerns with Nicholas and his parenting abilities. As mentioned above, she has known Nicholas to use illegal drugs and to drink alcohol excessively. She testified that she suspects that Nicholas is currently using drugs and alcohol based upon his behaviors. She did concede that she had not actually observed Nicholas using drugs since October 2019, when she last saw him use marijuana. In the temporary order, the district court ordered Nicholas to comply with alcohol testing prior to and during his parenting time with Rayder. Kathryn believed that Nicholas had missed "some" tests prior to visits and affirmatively indicated that he had failed one test in May 2020. We note that our review of Nicholas' testing records do not reveal many, if any, missed tests from March 2020 through the time of the modification trial. However, such records do indicate that Nicholas had a positive test in May 2020.

Kathryn testified regarding her concerns with Nicholas' mental health. She believes Nicholas struggles with anger issues and exhibits erratic behaviors. She explained that since 2018, Nicholas has talked about committing suicide, has on occasion acted like he was preparing to commit suicide, and has pretended he was dying. Nicholas has previously told her he would seek help, but, according to Kathryn, he never did. Kathryn noted that Nicholas' mother and sister have also expressed concern for Nicholas' mental health. At one point, Nicholas told Kathryn that he was sexually abused by his mother when he was a child and that he was concerned about his mother bathing Rayder. Nicholas later denied these allegations and now allows his mom to care for Rayder regularly.

As an example of Nicholas' erratic behaviors, Kathryn offered into evidence text messages she had received from Nicholas since their break-up in October 2019. Such messages included Nicholas calling her derogatory and vulgar names and using profanities. Nicholas often texted her repeatedly and, without any clear provocation, the messages become angrier and more derogatory when she did not immediately respond. Some of the more mild examples of Nicholas' text messages include: "Hate you"; You being a slut caused this"; "Old man slut"; and "You're a lieing, hiding, stealing hoe." Many of the messages were much more profane. Intermingled with these messages were messages from Nicholas asking Kathryn to get back together with him and expressing how much he missed her. Nicholas also sent text messages to Kathryn's mother, calling her derogatory names and, at one point, wishing her dead.

Kathryn also provided evidence of voice mails Nicholas left on her cellular telephone, one he made with Rayder present, where he called her names and used profanities. On one occasion, Nicholas called her 47 times in a row when she would not answer her telephone. Kathryn testified that she had observed Nicholas to call her names and to speak negatively about her in Rayder's presence. Nicholas also told Kathryn that he is going to talk to Rayder about the court proceedings and tell Rayder that Kathryn is the reason that he cannot spend more time with Nicholas.

Kathryn indicated that despite Nicholas' repeated text messages to her, he refuses to communicate with her regarding Rayder. She explained that Nicholas would not consistently utilize the Talking Parents Application to communicate with her, even though such communication

was required pursuant to their agreed upon parenting plan. Kathryn testified that prior to a few days before the start of the modification hearing, Nicholas had not used the application in over three months. Kathryn sent Nicholas notice of Rayder's appointments and events through the application, but Nicholas failed to view such information. In addition, Kathryn used the application to attempt to have discussions with Nicholas about enrolling Rayder in preschool and in other activities. Nicholas would not participate in such discussions.

Partly as a result of Nicholas' failure to utilize the Talking Parents Application, he has not assisted in paying for Rayder's preschool or his medical bills. Nicholas is also not current on his child support obligation. Records offered into evidence by Kathryn revealed that Nicholas owed $2,015 in child support arrearages just prior to the first day of the modification trial.

Kathryn testified that she believes that Nicholas can be a good father to Rayder. She knows that Nicholas loves Rayder and spends time doing "boy stuff" with Rayder outdoors. However, she is also concerned about Nicholas' anger, his abusive treatment of her, and his ongoing substance abuse. As a result of these concerns, Kathryn asked that she be awarded sole legal custody of Rayder. She also asked that Nicholas have limited parenting time with Rayder until he completes an anger management program and follows the treatment recommendations from his 2019 drug and alcohol evaluation. Kathryn indicated that after Nicholas has addressed some of his issues, she would be willing to attend counseling with him in order to address their ability to effectively co-parent.

Kathryn also asked the district court to award her attorney fees, particularly in light of Nicholas' behaviors during the modification proceedings which had caused her to incur additional fees. Such behaviors included, not paying his child support regularly, responding late to discovery requests, cancelling his deposition on short notice, and acting disrespectful when he did appear for his deposition.

Kathryn called her mother, Alette Hain, to testify on her behalf. Alette generally corroborated Kathryn's testimony regarding Nicholas' escalating behaviors. Alette described Nicholas as being a nice and helpful person until he is denied what he wants. He then tends to act out in anger. She indicated that she had been a victim of that anger. Alette expressed concern for Rayder's safety as a result of Nicholas' anger issues. In addition, she believed that Rayder's recent outbursts were the result of his time with Nicholas. Alette believed that Nicholas also had issues with jealousy, as he used to complain that Kathryn spent too much time with Rayder and her daughter, and not enough time with him.

Alette is very close with Kathryn and Rayder, seeing them at least five times per week. She has observed Kathryn and Rayder to have a loving relationship, often playing together, going places together, and attending activities and appointments together.

Nicholas testified that he currently lives alone in his own home. He was not at that time in a romantic relationship with anyone. Nicholas has owned a paint contracting company for the past six years, but testified that in 2019 and 2020, the business' income, and thus his income, had declined. Nicholas described having a close relationship with Rayder and wanting to be very involved in Rayder's everyday life. Nicholas testified that when he and Rayder are together they like to play legos, cars, sports, and board games, and also like to ride four-wheelers and dirt bikes. When he does not see Rayder, he tries to do video calls with him in order to spend additional time together. Nicholas described Rayder as generally being happy, energetic, and playful.

During his testimony, Nicholas denied Kathryn's assertions that he was currently using illegal drugs and abusing alcohol. He admitted to using methamphetamine in 2017 and 2018, but indicated he had not used any methamphetamine since that time period. He also testified that he had never parented Rayder while he was under the influence of methamphetamine. Nicholas admitted to using cocaine "a couple" of times in 2016, but denied using it since then. He also admitted to using marijuana a few times per week through January 2020. Nicholas explained that he stopped using marijuana without any drug treatment. Nicholas testified that he drinks alcohol a "couple of times a month," but never when Rayder is present. Nicholas indicated that despite having to take a drug and alcohol test prior to every visit with Rayder, he had only one positive test since the entry of the temporary order in March 2020. However, Nicholas conceded that there were instances where he did not comply with testing.

Nicholas testified regarding his conviction for driving under the influence in May 2019. He explained that he was ultimately sentenced to 45 days of house arrest and an 18-month suspension of his driver's license during which he was allowed to drive with an interlock. By the time of the modification trial, his driver's license had been reinstated. Despite having participated in a drug and alcohol evaluation in conjunction with the criminal proceedings related to his driving under the influence charge, he had not followed the recommendations from that evaluation, including obtaining any form of drug and alcohol treatment. Nicholas also admitted that he was also convicted of driving under the influence in 2010.

Nicholas denied Kathryn's assertions that he suffered from any mental health problems. Nicholas indicated that during the modification proceedings, he did briefly seek the help of mental health practitioners in order to help him deal with his and Kathryn's break up. However, he discontinued such therapy in the fall of 2020 after only three to five months. Nicholas cited the expense of the sessions as his reason for ending such treatment. Nicholas expressed a willingness to seek continued counseling with Kathryn in order to improve their communication. He also expressed a willingness to explore counseling for Rayder.

Nicholas' testimony began on March 19 and ended on April 29, 2021. On the first day of trial, Nicholas conceded that some of his text messages to Kathryn were mean and inappropriate. However, he believed such messages were partly Kathryn's fault, as he sent them after being "pretty heartbroken" as a result of their breakup. However, in his April testimony Nicholas admitted that he had continued to send inappropriate messages during the interim period between the two days of trial. Such recent messages included Nicholas telling Kathryn to "[b]e a hateful bitch all you want. Still got to deal with me rest of your life. Get over yourself."

Nicholas agreed with Kathryn that they have a very hard time communicating about Rayder. In fact, he testified that there was currently "zero" communication between him and Kathryn. Nicholas appeared to blame such difficulty in communication on Kathryn's insistence about using the Talking Parents Application. He testified that he did not think that communicating through the application was very effective. He believed that Kathryn used that form of communication only to control the decisionmaking about Rayder's life. He admitted that he had not followed that portion of the parenting plan which required their communication to take place through the application.

Nicholas also admitted that he was behind on his child support payments and that he had not paid Kathryn for Rayder's preschool or his medical bills. He testified that he was simply unable to afford to pay.

Nicholas expressed some concerns with Kathryn's parenting abilities. Such concerns included Kathryn's brother, who is a registered sex offender, being around Rayder on holidays and other special occasions and Kathryn on occasion leaving Rayder with only her 13-year-old daughter to supervise him.

Ultimately, Nicholas asked the court to modify the order of paternity and support to award he and Kathryn joint physical custody of Rayder such that Rayder spend every other week with Nicholas and every other week with Kathryn. Nicholas believed such joint custody arrangement was in Rayder's best interests. However, he also indicated that he would be "okay" if the court declined to modify the previous parenting time order contained within the order of paternity and support. Nicholas indicated that he was very unhappy with the limited amount of time he was able to spend with Rayder under the March 2020 temporary order. Nicholas also asked the district court to modify his child support obligation given Kathryn's increased income and his decreased income.

As a part of his case, Nicholas also called Jennifer Cromwell to testify. Cromwell was an acquaintance of Nicholas who had supervised 30 visits between Nicholas and Rayder from March to June 2020. She described Nicholas and Rayder to have a good relationship and indicated that they appeared well-bonded to each other. Cromwell testified that during the visits, Nicholas was very "hands-on" with Rayder, playing with him and spending all their time together. Rayder appeared happy with Nicholas and was typically "reluctant" to leave when the visits were over. Cromwell had no concerns about Rayder's safety or about Nicholas' parenting abilities during the visits. She described Nicholas as being a safe and stable parent who never exhibited any anger and never spoke negatively about Kathryn or the court proceedings.

On August 6, 2021, the district court entered an order of modification. The court found that a material change in circumstances had occurred which warranted modifying the original order of paternity and support to award Kathryn with sole legal custody of Rayder:

> The court finds a material change in circumstances since entry of its order in November 2018, that being, [Nicholas'] behavior has deteriorated to the point where his communications to [Kathryn] are either non-existent or non-productive. At times, these negative communications take place in front of Rayder. [Kathryn] and Rayder's maternal grandmother testified that Rayder has started to exhibit anger issues with some aggressive behaviors. There is no indication [Nicholas] will change his attitude or behavior, and [Kathryn]'s claim that [Nicholas] is impossible to communicate with is supported by the evidence.

> The court finds it is in Rayder's best interest that his legal custody be awarded solely to [Kathryn]. Despite the amount of time that has passed, [Nicholas'] anger toward [Kathryn] remains, and he is unable to put aside his personal differences with [Kathryn] when it comes to communicating with her and/or making decisions impacting Rayder.

The court further found that based upon "the same reasons" that supported a modification to legal custody, Nicholas' parenting time with Rayder should also be modified. The court divided

the modified parenting time into two phases. During Phase I, Nicholas was to have parenting time with Rayder every other weekend beginning on Friday after school through the following Monday at the commencement of school. Also during Phase I, Nicholas was to attend and satisfactorily complete an anger management program along with any recommended aftercare and any recommended individual or group therapy. After Nicholas completed Phase I, his parenting time was to transition to Phase II. During Phase II, Nicholas was to have parenting time with Rayder every other weekend beginning on Wednesday after school through the following Monday at the commencement of school.

In the modification order, the district court reduced Nicholas' child support obligation from $868 per month as ordered in the original order of paternity and support to $763 per month. In reducing child support, the district court relied on evidence demonstrating Nicholas' 2017, 2018, and 2019 annual incomes. The court found that after removing a deduction made for depreciation in 2019, Nicholas' income in all three years was "very similar." The court utilized an average of Nicholas' income during 2017, 2018, and 2019 to determine his income for child support purposes.

Finally, the court ordered Nicholas to pay $5,000 toward Kathryn's attorney fees. The court found credible evidence presented by Kathryn which demonstrated that Nicholas' actions, or inactions, during the modification proceedings necessitated additional time and work from Kathryn's counsel. The court concluded, "Given the equities of the case and after considering the [evidence of Nicholas' actions], the court finds an award of attorney fees is appropriate.

Nicholas appeals from the order of modification here.

## III. ASSIGNMENTS OF ERROR

Renumbered, Nicholas argues on appeal that the district court erred in (1) temporarily suspending his visitation during the pendency of the modification proceedings without holding a timely hearing; (2) finding a material change of circumstances which warranted awarding Kathryn sole legal custody and altering his parenting time; (3) failing to modify the order of paternity and support to award the parties with joint physical custody; (4) calculating his current income for purposes of child support; and (5) awarding Kathryn $5,000 in attorney fees.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Vyhlidal v. Vyhlidal*, 309 Neb. 376, 960 N.W.2d 309 (2021).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). However, where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020).

## V. ANALYSIS

### 1. EX PARTE ORDER SUSPENDING NICHOLAS' PARENTING TIME

In his brief on appeal, Nicholas asserts that the district court abused its discretion in entering an ex parte order suspending his parenting time with Rayder and then scheduling a hearing on the ex parte order more than 10 days after its issuance. Nicholas asserts that the district court's actions violated the directive found in Neb. Rev. Stat. § 42-357 (Reissue 2016) and disrupted his right to be involved in Rayder's life.

Section 42-357 appears in Article 3 of Chapter 42 of the Nebraska Revised Statutes. Article 3 is entitled, "Divorce, Alimony, and Child Support." Section 42-357 provides, in part:

> During the pendency of any proceeding under sections 42-347 to 42-381 after the complaint is filed, upon application of either party and if the accompanying affidavit of the party or his or her agent shows to the court that the party is entitled thereto, the court may issue ex parte orders . . . (3) determining the temporary custody of any minor children of the marriage[.] Ex parte orders issued pursuant to subdivision[] . . . (3) of this section shall remain in force for no more than ten days or until a hearing is held thereon, whichever is earlier.

Both the title of the Article in which § 42-357 appears and the language of the statutory section itself clearly indicates that such statute applies in divorce proceedings. Nicholas does not point us to any caselaw or other statute which applies the language of § 42-357 to cases involving modification in a paternity action. We are, nonetheless, troubled by the length of time that elapsed between the issuance of the ex parte order and the temporary hearing. However, even if we were to find that the 10-day time limitation in § 42-357 applies in a paternity case like this, we could not afford relief to Nicholas from the court's ruling on a temporary order. See *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009).

A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *Id.* See, also, *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). The issue of the district court entering an ex parte order temporarily suspending Nicholas' parenting time was relevant only from the time it was entered until it was replaced by the order determining permanent custody and a permanent parenting time schedule. Accordingly, any issue relating to the temporary ex parte order is moot and need not be resolved in this appeal. See *id*.

### 2. MODIFICATION OF ORDER OF PATERNITY AND SUPPORT

Nicholas asserts that the district court abused its discretion in modifying the original order of paternity and support by awarding Kathryn sole legal custody of Rayder and by altering the parenting time plan. Nicholas argues that Kathryn failed to prove a material change in circumstances which warranted any such modification. Upon our review, we affirm the decision of the district court to award Kathryn sole legal custody of Rayder and to modify the parenting time plan.

In a child custody modification action the party seeking modification must demonstrate first that a material change in circumstances has occurred after the entry of the previous custody

order which affects the best interests of the child and that it is in the child's best interests that custody be changed. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). The party seeking modification of child custody bears the burden of showing as an initial matter that there has been a change in circumstances. *Id.*

The child's best interests require a parenting arrangement and plan which provides for a child's safety, emotional growth, health, stability, physical care, and regular and continuous school attendance and progress. Neb. Rev. Stat. § 43-2923 (Reissue 2016). Moreover, § 43-2923 sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody. Such factors include the relationship of the minor child with each parent, the desires of the minor child, the general health and well-being of the minor child, and credible evidence of abuse inflicted on the child by any family or household member.

In its order, the district court found that a material change in circumstances had occurred since the entry of the order of paternity and support which warranted modification of Rayder's legal custody. Specifically, the court found a material change in circumstances as a result of Nicholas' behavior toward Kathryn. The court indicated that such behavior had significantly and dramatically deteriorated since entry of the original order and that, as a result of such deterioration, Nicholas "is impossible to communicate with." The court further indicated that the evidence presented at the modification trial demonstrated that despite the length of time that had passed since the parties ended their relationship, Nicholas' "anger toward [Kathryn] remains and he is unable to put aside his personal differences with [Kathryn] when it comes to communicating with her and/or making decisions impacting Rayder."

Upon our review of the record, we agree with the district court that Nicholas' ongoing anger and inappropriate communication with Kathryn constitutes a material change in circumstances which warranted modification of the prior order to award Kathryn with sole legal custody. The evidence presented at the modification trial revealed that the parties quickly rekindled their relationship after the entry of the order of paternity and support in November 2018. The parties then ended their rekindled relationship for the final time in October 2019. After this time, Nicholas began a pattern of vicious, profanity-laced communication toward Kathryn that continued through the first day of trial and up to the final day a month later. As detailed by the examples of such communication provided in the background section above, Nicholas' anger was consistently expressed in a stream of vitriol toward Kathryn. And, although Kathryn often did not respond to his text messages and telephone calls, Nicholas would continue to berate and belittle her.

Despite the amount of communication Nicholas directed toward Kathryn, he generally refused to discuss Rayder. He would not engage with the Talking Parents Application, which was the required form of communication between him and Kathryn and which Kathryn regularly used in an attempt to provide information to Nicholas about Rayder. Nicholas did not respond to messages from Kathryn which related to enrolling Rayder in preschool, to signing Rayder up for various activities, or to scheduling medical appointments for Rayder. Instead, Nicholas continued to provide Kathryn with only negativity and anger.

- 10 -

At trial Nicholas blamed his inappropriate communication tactics on how heartbroken he was due to the end of his relationship. However, such communication continued more than 18 months after the parties had ended their relationship. Nicholas attempted to justify his ongoing angry behavior at least in part on Kathryn's decision to terminate their relationship which necessarily meant that he could not see Rayder on a daily basis.

Given Nicholas' inappropriate communications with Kathryn and given the length of time such communications persisted, we find that a material change in circumstances had occurred since entry of the order of paternity and support which warranted a modification of legal custody. Specifically, had the district court known at the time the order of paternity and support was entered that Nicholas would be unable to engage in meaningful and appropriate conversations about Rayder's needs and wants, the district court would not have awarded the parties with joint legal custody. We affirm the order of the district court awarding Kathryn sole legal custody of Rayder.

The district court also found that Nicholas' inappropriate communications with Kathryn constituted a material change in circumstances which warranted a modification to the parenting time plan delineated in the order of paternity and support. Specifically, the court found that "[Kathryn]'s proposal that [Nicholas] complete anger management is supported by the evidence and in Rayder's best interest." The district court modified the prior order to permit Nicholas to have parenting time with Rayder only every other weekend until he successfully completed an anger management program along with any recommended aftercare and any recommended individual or group therapy. After that, he was permitted to resume having five days of parenting time during every 2-week period. We cannot say that the district court's finding of a material change in circumstances warranting a change to the parenting time plan was an abuse of discretion.

At trial, Kathryn testified and provided evidence to demonstrate that Nicholas had engaged in negative communication with her in Rayder's presence, including name calling, using profanities, and speaking negatively about Kathryn's parenting skills and her extended family. Kathryn also testified about her concern that Rayder is starting to exhibit some of Nicholas' negative and aggressive behaviors. Kathryn is concerned that Nicholas' behavior during his parenting time is causing Rayder to act out. Taking into consideration the evidence of Nicholas' ongoing negative communications with Kathryn together with the evidence of the effects of such negativity on Rayder, we cannot say that the district court abused its discretion in temporarily modifying the parenting plan in order to require Nicholas to attend an anger management program and the recommended follow-up before resuming his more extended parenting time with Rayder. Such a program will not only serve to improve Nicholas' ability to appropriately communicate with Kathryn as a co-parent, but will also improve Nicholas' ability to appropriately parent Rayder. We affirm the decision of the district court that there was a material change in circumstances which warranted modifying the original order of paternity and support by awarding Kathryn sole legal custody of Rayder and by temporarily decreasing Nicholas' parenting time until his successful completion of an anger management program and recommended aftercare and therapy.

We note that in his brief to this court, Nicholas does not argue that either the modification of legal custody or the modification to the parenting plan was not in Rayder's best interests. Instead, he merely challenges the district court's finding that there was a material change in circumstances which justified such modifications. However, upon our review, we agree with the

district court that both the award of sole legal custody to Kathryn and the temporary reduction in Nicholas' parenting time are modifications that are in Rayder's best interests.

### 3. No Modification of Physical Custody

In his cross-complaint, Nicholas affirmatively asked the district court to modify the order of paternity and support to award he and Kathryn joint physical custody of Rayder. Nicholas also testified regarding this request at the modification trial. In the modification order, the district court did not specifically address Nicholas' request for joint physical custody, but implicitly denied such request by finding that the modified parenting plan, which continued sole physical custody of Rayder with Kathryn, was in Rayder's best interests and should be adhered to by both parties. On appeal, Nicholas asserts that the district court erred in failing to find that joint physical custody was in Rayder's best interests.

As we discussed above, in a child custody modification action the party seeking modification must first demonstrate that a material change in circumstances has occurred after the entry of the previous custody order which affects the best interests of the child and then demonstrate that the modification is in the child's best interests. See *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). On appeal, Nicholas asserts that the district court erred in failing to find that modifying the original decree to award the parties with joint physical custody was in Rayder's best interests. However, in our analysis, we do not reach the best interests determination, as we conclude that Nicholas failed to demonstrate that a material change in circumstances occurred after the entry of the previous physical custody order which affected Rayder's best interests.

Nicholas presented virtually no evidence during the modification trial which would demonstrate a basis to modify Rayder's physical custody. During his testimony, Nicholas vaguely contended that he had concerns regarding Kathryn's extended family members and regarding her sometimes leaving Rayder in the care of her 13-year-old daughter. However, Nicholas did not present any other evidence to suggest that Kathryn was not an appropriate and involved parent. Rather, his main issue with Kathryn appeared to be her commencing the modification proceedings which ultimately resulted in him having less time with Rayder. Nicholas simply testified to his belief that joint physical custody would be in Rayder's best interests, without providing any evidence of a material change that would necessitate a modification of physical custody. Moreover, we note that during his testimony, Nicholas expressed some agreement with the parenting plan delineated in the original decree of paternity and support which awarded Kathryn sole physical custody, when he affirmed he could "live with" that parenting plan.

Upon our review, we cannot find that the district court abused its discretion in implicitly denying Nicholas' request for joint physical custody because Nicholas did not demonstrate that a material change in circumstances occurred after the entry of the previous custody order which affected Rayder's best interests and which warranted a change to Rayder's physical custody.

### 4. Child Support

At trial, Nicholas testified that he owned his own painting business from which he derived his income. Evidence of Nicholas' income from the years 2016, 2017, 2018, and 2019 was admitted into evidence. Such evidence revealed that in 2016, Nicholas earned $92,118. In 2017,

he earned $73,558 and, similarly, in 2018, he earned $73,321. In 2019, Nicholas indicated that his income significantly decreased. His 2019 individual tax return indicated he earned $51,684 that year. Nicholas did not offer evidence of his 2020 tax return, but did testify that his 2020 income was similar to his 2019 income. However, Nicholas also testified that 2019 was not a "typical" year for him in terms of business and earnings. He attributed the atypical earnings in 2019 and in 2020 to the COVID-19 pandemic and to struggles with his business marketing.

In the modification order, the district court calculated Nicholas' income for child support purposes by using the average of Nicholas' income for 2017, 2018, and 2019. However, in calculating Nicholas' 2019 income, the court explained as follows:

> The only business tax return [Nicholas] offered [for his painting business] was for 2019. It reflects he claimed $19,501 in depreciation. [Nicholas] failed to meet his burden of proof that he is entitled to deduct depreciation from his income. See e.g., Neb. Ct. R. § 4-204; *Hotz v. Hotz*, 301 Neb. 102, 112 (2018). The court was also provided with no information as to whether and in what amounts depreciation was deducted in 2017 or 2018 to determine whether there has been a material change in circumstances or not. Without the deduction for depreciation in 2019, [Nicholas]' 2019 income is approximately $71,185 -- very similar to his income in 2017 and 2018.

Using the average of Nicholas' 2017 and 2018 incomes along with his 2019 income with the deduction for depreciation added back in, the district court calculated Nicholas' income for child support to be $6,057 per month.

On appeal, Nicholas argues that the district court erred in incorrectly calculating his income for child support purposes. He contends that his income should have been based solely upon the amount of gross income reported on his 2019 individual income tax return, $51,684. Nicholas asserts that the evidence presented at the modification trial clearly indicated that his income had significantly decreased in 2019 and 2020 and that such lower income was expected to continue. He further asserts that had the district court correctly calculated his income, the court would have reduced his child support obligation even further. Upon our review, we affirm the decision of the district court in its calculation of Nicholas' income for child support purposes.

A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Id*.

The primary concern in determining child support is the best interests of the child. See *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017). The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to

the support of their children in proportion to their respective incomes. *Roberts v. Roberts, supra*. In general, child support payments should be set according to the Nebraska Child Support Guidelines, which compute the presumptive share of each parent's child support obligation. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

In calculating Nicholas' income for child support purposes, we first affirm the district court's decision to add back in the depreciation Nicholas claimed on his corporate tax return, and thus, on his individual tax return in 2019. While the Nebraska Child Support Guidelines do permit an allowance of depreciation as a deduction from total monthly income, the guidelines also provide specific instructions for proving an entitlement to the deduction and how the deduction should be calculated. Neb. Ct. R. § 4-204. Further, § 4-204 provides that "[a] party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction."

The most basic requirement for proving an entitlement to a deduction is: "Any party claiming an allowance of depreciation as a deduction from income shall furnish to the court and the other party copies of a minimum of 5 years' tax returns at least 14 days before any hearing pertaining to the allowance of the deduction." § 4-204. In addition, § 4-204 requires that a depreciated asset must be shown to be ordinary and necessary and that the depreciation was calculated by using the "'straight-line'" method.

Here, Nicholas did not submit five years of tax returns. The evidence submitted at trial constituted only four years of Nicholas' individual tax returns (2016-2019) and only one year of his corporate tax returns (2019). It is only his 2019 corporate return that includes a deduction for depreciation. Thus, as the district court indicated in its modification order, it is impossible to know whether or how much business depreciation was claimed by Nicholas in any other tax years. Furthermore, Nicholas' 2019 corporate tax return did not provide any indication of what the depreciated asset or assets were, whether any such items were ordinary and necessary, and whether a straight line depreciation was applied. Nicholas did not meet his burden of proof to establish his entitlement to the depreciated amount. As such, as did the district court, we calculate Nicholas 2019 income to be $71,185.

Additionally, we find no abuse of discretion in the district court's decision to utilize an average of Nicholas' incomes in the years 2017, 2018, and 2019 in calculating his income for child support purposes. Given that Nicholas' income did vary from year to year, the district court's averaging of three years' incomes was appropriate. We further note that such averaging did not result in a significantly higher obligation than what would have resulted from using only Nicholas' 2019 income.

### 5. ATTORNEY FEES

On appeal, Nicholas also contends that the district court erred in awarding Kathryn any attorney fees. He contends that Kathryn's modification action was frivolous in nature and that "after all was said and done," the prior parenting time order was not really modified given that he was still awarded 5 days of parenting time every two weeks. Brief for appellant at 24. Upon our review, we find no abuse of discretion in the district court's decision to award Kathryn $5,000 in attorney fees.

As a general rule, attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been

to allow recovery of attorney fees. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). Although attorney fees and costs are statutorily allowed in paternity and child support cases, customarily they are awarded only to the prevailing party or assessed against those who file frivolous suits. *Id*. And, an award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016).

Contrary to Nicholas' assertions in his brief on appeal, Kathryn was the prevailing party in the modification action in that the district court granted her request to modify the original order of paternity and support by awarding her sole legal custody of Rayder and by reducing Nicholas' parenting time with Rayder until such time as he successfully completed the requirements of Phase I of the parenting plan. Kathryn also prevailed in this action by successfully defending against Nicholas' request for joint physical custody of Rayder. As the prevailing party in this litigation, Kathryn was entitled to an award of attorney fees and we can find no abuse of discretion in the court's decision to award $5,000 in attorney fees to her. This is particularly true given Kathryn's testimony and evidence which demonstrated that Nicholas' actions during the proceedings resulted in her incurring increased attorney fees. Such actions included not paying his child support regularly, responding late to discovery requests, cancelling his deposition on short notice, and acting disrespectful when he did appear for his deposition.

## VI. CONCLUSION

Upon our de novo review of the record, we find no abuse of discretion in the district court's order of modification which found a material change in circumstances that affected the child's best interests and that warranted a change in legal custody and in Nicholas' parenting time. We also find no abuse of discretion in the district court's denial of Nicholas' request to modify physical custody, in its calculation of Nicholas' income for child support purposes, or in its award of attorney fees to Kathryn. We therefore affirm the court's order of modification in its entirety.

AFFIRMED.